677 A.2d 734

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ALLEN JAMES, DEFENDANT–APPELLANT.

Argued March 11, 1996—Decided June 20, 1996.

540

*Steven M. Gilson,* Designated Counsel, argued the cause for appellant (*Susan L. Reisner,* Public Defender, attorney).

*Terry S. Bogorad,* Assistant Prosecutor, argued the cause for respondent (*Ronald S. Fava,* Passaic County Prosecutor, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the scope of defendant's Sixth Amendment right to confront a witness and defendant's Fifth Amendment due process right to prohibit the introduction into evidence of an identification that resulted from impermissibly suggestive police procedures. Specifically, the issue is whether the trial court erred in ruling that defendant would waive his objection to the victim's suppressed identification of him if he questioned the victim about his earlier misidentification of defendant or about his description of the perpetrator.

I

At approximately 12:00 p.m. on August 6, 1991, Mohamed Abaza was driving his car in Paterson on the way to the unemployment office. He was driving alone with his windows down. As Abaza's car approached a stop sign at an intersection, a man waved for him to stop. When Abaza stopped his car, the man walked toward the driver's side window. The culprit then pulled out a handgun, pointed it at Abaza's left shoulder, and demanded that he exit the car. Abaza immediately got out of the vehicle, and the man wielding the gun entered the driver's side of the automobile. Abaza testified that while the gunman was making his way into the driver's seat, a second man entered the passenger side of the vehicle. The two assailants then drove off in Abaza's car. At trial, Abaza testified that he was able to see the faces of both assailants clearly.

Immediately after the assailants fled, Abaza walked across the street to a pay phone and called the police. The police arrived on the scene within an hour. The victim explained to the officers what had transpired. At the time, he described the man wielding the gun as being 5'11", thin, approximately thirty-years old, and having short, cropped hair. After some brief questioning, the police invited Abaza to go with them to the station to look through some photograph books in order to identify the assailants.

When they arrived at the police station, the officers provided Abaza with a few photograph books to review. After examining the books, the victim purportedly identified both perpetrators. He identified a photograph of Luis Vincent as a picture of the person who entered his car on the passenger side and a photograph of Malcolm Johnson as a picture of the person who pointed the gun at him. At the time, Abaza told the police that he was 110% sure about the identifications that he had made.

A few days after the victim identified Luis Vincent, the police located Vincent in the Passaic County jail. They had Vincent transported to the Paterson police station and charged him with robbery, contrary to *N.J.S.A.* 2C:15–1. After being advised of his

*Miranda* rights, Vincent declined to make a statement. However, he did volunteer that he was with defendant. Vincent did not specifically state that he was with defendant on the day of the carjacking. Nonetheless, the police quickly narrowed in on defendant as the possible second culprit.

Two weeks after he made his initial identification, Abaza contacted the police and stated that he was no longer positive that the photograph of Malcolm Johnson was the picture of the person who stole his car at gunpoint. However, he indicated that he was still confident about the accuracy of his selection of Vincent's photograph.

On August 20, approximately two weeks after the carjacking, the police invited Abaza to return to the police station to look through some more photographs. When Abaza returned to the police station to make the identification, he was seated twenty-five to thirty feet away from defendant. In fact, the victim admits to having seen defendant seated in the corner of the room when he entered the detective bureau. Moreover, when Abaza arrived at the detective bureau, he was told that the police had conducted an investigation and that Malcolm Johnson, the man whom Abaza had previously identified as the carjacker, could not have been the culprit. He was also informed that the police had arrested another suspect and that the new suspect was present in the detective bureau. The police gave this information to the victim minutes *before* they presented the victim with a collection of ten photographs of black males, one of which included defendant, Allen James. Abaza picked out defendant's photograph as the picture of the man who pointed the gun at him and asked him to exit the car.

An indictment was filed, charging defendant Allen James and codefendant Luis Vincent with first-degree robbery, contrary to *N.J.S.A.* 2C:15–1. At a *Wade*[1] hearing, defendant moved to suppress any testimony regarding the out-of-court identification

---

[1] *United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967).

and any in-court identification resulting therefrom, claiming that the identification procedures used by the police were impermissibly suggestive. In accordance with *State v. Madison*, 109 *N.J.* 223, 232–33, 536 *A.*2d 254 (1988), the trial court granted defendant's motion to suppress, finding that the out-of-court identification procedures were impermissibly suggestive and that there were not sufficient indicia of reliability to outweigh the corrupting effect of the suggestive identification.

Further, the court determined that the State had not established by clear and convincing evidence that there was an independent source for the victim to make an in-court identification, and therefore the court ruled that the State would not have the benefit of an in-court identification by Abaza. *Accord Manson v. Brathwaite*, 432 *U.S.* 98, 114, 97 *S.Ct.* 2243, 2253, 53 *L.Ed.*2d 140, 154 (1977); *Neil v. Biggers*, 409 *U.S.* 188, 198–99, 93 *S.Ct.* 375, 381–82, 34 *L.Ed.*2d 401, 410–11 (1972); *Simmons v. United States*, 390 *U.S.* 377, 384, 88 *S.Ct.* 967, 971, 19 *L.Ed.*2d 1247, 1253 (1968); *State v. Ford*, 79 *N.J.* 136, 136–37, 398 *A.*2d 95 (1979) (Pashman, J., concurring). In making this determination, the court weighed the corruptive effect of the suggestive procedures against the factors this court deemed relevant in *Madison, supra*, 109 *N.J.* at 239–40, 536 *A.*2d 254. Those factors include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the time of the identification, and the time between the crime and the identification. *Ibid.* (quoting *Manson, supra*, 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154).

Immediately after the *Wade* hearing, Luis Vincent entered a guilty plea to receiving stolen property. As part of the plea agreement with Vincent, the State dismissed the robbery charge and stipulated that when it made a recommendation at his sentencing hearing, it would consider his undertaking to testify truthfully at defendant's trial.

At trial, on direct examination, the victim made an in-court identification of Luis Vincent as the man who entered the passenger side of the car. On cross-examination, defense counsel asked the victim to provide a physical description of the gunman who flagged down the car. The State immediately objected and asked for a sidebar conference. Outside the presence of the jury, defense counsel argued that she planned to ask the victim about his description of the perpetrator on the day of the carjacking because that description did not match the police officer's description of defendant on the day defendant was arrested. For example, the victim had indicated in pretrial motions that the person whom he saw with the gun had very closely cropped hair. However, a police report indicated that when defendant was arrested he wore his hair in long braids. The trial court responded that it considered the description and the identification procedures to be intertwined. Therefore, if defense counsel inquired into the victim's original description of the assailant, the State would be allowed to introduce evidence of the impermissibly suggestive identification. After noting her objection for the record, defense counsel withdrew the question.

The State's other major witness was Luis Vincent, who testified that he saw defendant flag down the victim and then proceed to enter the victim's vehicle. During the direct examination, the State asked Vincent why he entered Mr. Abaza's car and how he knew defendant was going to take the car by unlawful means from its owner. Vincent responded that he got in the car for a ride and that he knew defendant "was up to something." When the State asked Vincent the basis for his answer, he responded, "He's that kind of person." Defense counsel objected to Vincent's answer as being speculative, and the State withdrew the question. The trial court, however, did not issue an instruction to the jury about how it should treat that question or that answer.

When the jury was deliberating, the trial court received a note from the jurors. The jurors requested a read-back of Abaza's testimony, in particular Abaza's identification of defendant. The

trial court informed the jurors that there "is no testimony in the case as to Mr. Abaza's identifying the defendant." The court then ordered that Abaza's testimony be read back. The jury convicted defendant of robbery.

The trial court denied defendant's motion for a new trial and found that defendant qualified as a persistent offender, thus making him eligible for an extended term. Defendant was sentenced to an extended term of imprisonment for thirty years with a twelve-year parole disqualifier.

Defendant appealed and the Appellate Division affirmed his conviction and sentence. We granted defendant's petition for certification, 142 *N.J.* 570, 667 *A.*2d 188 (1995), and now reverse.

II

Defendant argues that he was denied his right of confrontation because the trial court erroneously ruled that defendant would waive his objection to the suppressed identification if defendant questioned the victim about his earlier misidentification or about his description of the perpetrator. After the *Wade* hearing, defense counsel informed the court that she planned to present evidence regarding the victim's initial identification of Malcolm Johnson as the perpetrator as well as the description of the perpetrator that the victim gave to the police immediately after the crime. The prosecutor indicated that he would respond to the introduction of such evidence by attempting to present evidence of the victim's subsequent identification of defendant as the culprit. The trial court refused to issue a ruling during the pretrial hearing and instead told defendant's counsel to raise the issue during the trial.

Just before the trial began, defense counsel again requested a ruling on whether she could cross-examine the victim about his identification of Malcolm Johnson as the perpetrator. In response, the trial court drew counsel's attention to *Pettijohn v. Hall*, 599 *F.*2d 476, 481 (1st Cir.), *cert. denied*, 444 *U.S.* 946, 100 *S.Ct.* 308, 62 *L.Ed.*2d 315 (1979), in which the court observed that

a defendant who introduces testimony that is intimately related with previously suppressed testimony will be deemed to have waived his objection to the introduction of that suppressed testimony. This exchange then followed:

[Defense Counsel]: Very good, Your Honor. With that notation I'm going to indicate for the purposes of the record that I will not be asking questions on the issue.

[The Court]: Well, I suggest that when we reach that point in the case, you ask the question and I'll make a ruling.

During the cross-examination of Abaza, the suppression issue arose again when defense counsel asked Abaza to give a physical description of the assailant who flagged him down and subsequently pointed a gun at him. Before the victim could respond, the prosecutor asked for a sidebar conference. Outside the presence of the jury, the State argued that if defense counsel were allowed to inquire into the description that the victim provided to the police on the day of the crime, then under *Pettijohn, supra,* the State should be allowed to introduce evidence that during the course of the investigation the victim did in fact identify defendant as the culprit. Defense counsel responded that she did not intend to question the victim about the identification of Malcolm Johnson because of her concern that she would open the door to redirect about the suggestive identification. Rather, she wanted the jury to hear how the victim's description of the assailant did not match the officer's description of defendant when he was arrested only weeks after the crime. After listening to both parties, the trial court stated:

It appears that the description and the identification procedures are all intertwined.

Certainly if you want to ask all the questions of the witness as to what description he gave of the person who came to the driver's side with the gun, if you want to pursue questioning of the witness as to whether or not he selected a photo on that very day of a person who was Malcolm Johnson, you may do so as a method of challenging the identity of Mr. James in this case, who I understand will later be identified by Mr. Vincent.

But under the *Petti[john]* case if the State wants to go further on redirect examination, it appears that there's strong potential for that for what ultimately happens so the jury has the full panoply of what took place by way of identification of the individual with the gun.

In response to the trial court's ruling, defense counsel withdrew her question regarding the victim's description of his assailant.

Defendant asserts that the trial court erred in its application of *Pettijohn, supra,* and thereby chilled and effectively restricted his cross-examination of the victim. According to defense counsel, the testimony that she planned to develop on cross-examination was not "intimately interrelated" to the suppressed identification, and therefore the trial court was wrong in holding that any question about the victim's identification would permit the State on redirect examination to ask questions about the suppressed identification.

The State, however, argues that defendant ignores the legal principle that the State is entitled to a fair trial in which defendant complies with established rules of procedure and evidence (citing *Chambers v. Mississippi,* 410 *U.S.* 284, 302, 93 *S.Ct.* 1038, 1049, 35 *L.Ed.2d* 297, 313 (1973)). According to the State, the right to elicit testimony that someone else committed an offense does not carry with it a corresponding right to restrict rebuttal testimony, and therefore the introduction of that type of evidence by defendant waives his objections to otherwise inadmissible evidence (citing *Pettijohn, supra,* 599 *F.*2d 476; *State v. Bogus,* 223 *N.J.Super.* 409, 422–23, 538 *A.*2d 1278 (App.Div.), *certif. denied,* 111 *N.J.* 567, 546 *A.*2d 497 (1988); *State v. Samurine,* 47 *N.J.Super.* 172, 180, 135 *A.*2d 574 (App.Div.1957), *rev'd on other grounds,* 27 *N.J.* 322, 142 *A.*2d 612 (1958)).

The Appellate Division agreed with the trial court's ruling that the victim's identification of defendant should be excluded from evidence only if defendant refrained from presenting evidence that the victim made a misidentification or gave a description that indicated that another person was the perpetrator. In reaching their conclusions, the trial court and Appellate Division relied almost exclusively on *Pettijohn, supra,* 599 *F.*2d 476.

In that case, the defendant, Carl Pettijohn, was convicted of armed robbery on the basis of the victim's eyewitness testimony. *Id.* at 477. Pettijohn allegedly robbed a security guard, David Smith, who was on duty at the time of the robbery. While

walking through the company parking lot, Smith was approached by a man holding two handguns. The man demanded that Smith give him money. The next day, Smith picked out a picture of Pettijohn from a group of nine police photographs and identified him as the robber. *Ibid.*

Frank Griffin, the manager of the company, witnessed the robbery from the first floor window of the company's building some forty feet away. The police also showed Griffin a group of nine photographs. *Id.* at 478. Griffin encountered serious difficulty when he attempted to identify the robber from the set of nine photographs. *Ibid.* He narrowed the selection down to two similar photographs: one was a photograph of Pettijohn, the other a photo of another man. Griffin picked the picture of the other man and stated, "I think that's him." *Ibid.* The police officer replied, "No it's not." Not surprisingly, Griffin then selected the photograph of Pettijohn and stated, "It's definitely this one." *Ibid.*

Prior to trial, Pettijohn moved to suppress the identifications of both Smith and Griffin. *Ibid.* The trial court ruled that Griffin's identification of Pettijohn was inadmissible due to the impermissibly suggestive police procedures. Any in-court identification by Griffin was also considered tainted by the police tactics, and therefore was also suppressed. The trial court declined to suppress the victim's identification. *Ibid.* During the trial, the defense sought to introduce Griffin's prior identification of another man. Defense counsel argued that he wished to call Griffin for the purpose of showing his identification of a person other than the defendant and for the purpose of impeaching Smith's identification. The trial court, the State appellate courts, and the federal district court all ruled that the testimony was inadmissible because the identification was neither material nor relevant. *Ibid.*

The First Circuit Court of Appeals, however, found that Pettijohn was constitutionally entitled to call Griffin to demonstrate that he was not the robber. The First Circuit concluded that evidence that someone other than the defendant was identified by

Griffin as the criminal was not only probative but critical to the issue of the defendant's guilt, and therefore the prior identification was relevant and material to Pettijohn's defense. *Id.* at 480. Exclusion of such relevant exculpatory evidence was found to have infringed upon the constitutional right of the accused to present witnesses in his own defense. Because the prosecution did not offer a sufficiently compelling purpose to justify the infringement upon Pettijohn's right of compulsory process, the First Circuit issued a writ of habeas corpus unless Massachusetts made arrangements for a new trial within ninety days.

If the defendant exercised his right to introduce Griffin's testimony in the new trial, the First Circuit declared that he would waive his rights in suppressing Griffin's other identifications. "Once a defendant attempts to introduce testimony that is intimately interrelated with previously suppressed testimony, the defendant waives his objections to the introduction of the related evidence." *Id.* at 481. Because the prosecution would be able to introduce the subsequent retraction and identification on cross-examination, the First Circuit reasoned that the jury would receive a full and balanced rendition of the facts. *Ibid.* Without such rebutting evidence, the First Circuit believed the jury might be unduly influenced by Griffin's initial selection of the wrong photograph. However, the First Circuit noted that if the suppressed identification had been *patently unreliable,* then it would be inappropriate to allow the identification to be used in rebuttal. *Id.* at 481. In the present matter, the lower courts appear to have ignored the First Circuit's statements with respect to the admissibility of *unreliable* identifications.

### III

There is no New Jersey case law directly on point. The few New Jersey cases that the State refers to in support of its position, namely, *State v. Knight,* 63 *N.J.* 187, 305 *A.*2d 793 (1973); *State v. Sette,* 259 *N.J.Super.* 156, 611 *A.*2d 1129 (App.Div.), *certif. denied,* 130 *N.J.* 597, 617 *A.*2d 1219 (1992); and *State v. Downey,*

237 *N.J.Super.* 4, 566 *A.*2d 822 (App.Div.1989), *certif. denied,* 121 *N.J.* 627, 583 *A.*2d 323 (1990), do not support the proposition for which they are cited. In those cases, the courts were asked to interpret basic evidence law. The defendants objected to the introduction of evidence that they believed was either (1) more prejudicial than probative, (2) irrelevant, or (3) inadmissible hearsay under the *New Jersey Rules of Evidence.* The courts found otherwise. However, in all three cases the trial courts had discretion over whether or not to admit the evidence in question. When the basis for a defendant's objection is within the discretion of the trial court, we have consistently interpreted this State's rules of procedure and evidence to permit the State to rebut testimony elicited by defense counsel and to permit the trial court to determine the admissibility of the rebuttal testimony. *State v. Sturdivant,* 31 *N.J.* 165, 177–78, 155 *A.*2d 771 (1959), *cert. denied,* 362 *U.S.* 956, 80 *S.Ct.* 873, 4 *L. Ed.*2d 873 (1960); *State v. Beard,* 16 *N.J.* 50, 59, 106 *A.*2d 265 (1954).

In the present matter, defendant's objection is not based on the *New Jersey Rules of Evidence.* It is defendant's constitutional right to due process that defendant claims protects him from the introduction into evidence of an identification ruled unreliable because it resulted from unnecessarily suggestive police procedures. Thus, in deciding the constitutionality of the trial court's ruling it is useful to examine how this Court has addressed similar constitutional claims as well as how courts from other jurisdictions have ruled on similar claims.

## IV

Several state and federal courts have considered whether, when a defendant puts a witness's identification in issue, the prosecution should be allowed to explore in rebuttal pretrial identifications that would otherwise be inadmissible because of constitutional violations. Those courts often base their decisions on the doctrines of "opening the door," "completeness," and "curative admis-

sibility." Although courts use those doctrines interchangeably, there are subtle differences between them.

The "opening the door" doctrine is essentially a rule of expanded relevancy and authorizes admitting evidence which oth- · erwise would have been irrelevant or inadmissible in order to respond to (1) *admissible evidence* that generates an issue, or (2) *inadmissible evidence* admitted by the court over objection. The doctrine of opening the door allows a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of related evidence. *United States v. Lum* 466 *F.Supp.* 328 (D.Del.), *aff'd*, 605 *F.*2d 1198 (3rd Cir.1979). That doctrine operates to prevent a defendant from successfully excluding from the prosecution's case-in-chief inadmissible evidence and then selectively introducing pieces of this evidence for the defendant's own advantage, without allowing the prosecution to place the evidence in its proper context. *Lum, supra,* 466 *F.Supp.* at 334–35. The "opening the door" rule has its limitations. For example, evidence is still subject to exclusion where a court finds that the probative value of the otherwise inadmissible responsive evidence "is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury...." *N.J.R.E.* 403.

When a witness testifies on cross-examination as to part of a conversation, statement, transaction or occurrence, under the doctrine of "completeness" the party calling the witness is allowed to elicit on redirect examination "the whole thereof, to the extent it relates to the same subject matter and concerns the specific matter opened up." *Virgin Islands v. Archibald*, 987 *F.*2d 180 (3d Cir.1993) (citation omitted); *cf. N.J.R.E.* 106 (specifying similar rule applicable only to writings and recorded statements). The theory behind the doctrine of completeness is "that the opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." 7 *Wigmore on Evidence,* § 2113, at 653

(Chadbourn rev. 1978). However, the doctrine of completeness does not apply to separate utterances. 7 *Wigmore on Evidence* § 2119 (Tillers rev. 1983). In the present matter, because the victim's description of the perpetrator and initial identification were separate utterances unrelated to the later identification of defendant, the doctrine of completeness technically does not apply.

The doctrine of "curative admissibility" provides that when one party introduces *inadmissible evidence,* thereafter the opposing party may introduce otherwise inadmissible evidence to rebut or explain the prior evidence. *United States v. Nardi,* 633 *F.*2d 972, 977 (1st Cir.1980). The doctrine applies only when inadmissible evidence has been allowed, when that evidence was prejudicial, and when the proffered testimony would counter that prejudice. *Ibid.* Many courts confuse the doctrine of curative admissibility with the doctrine of "opening the door." They fail to recognize that the former doctrine applies only when a party introduces inadmissible evidence. In the present matter, because the State does not argue that the testimony that defendant would have elicited from the victim concerning his description or prior misidentification is inadmissible evidence, the doctrine of curative admissibility technically does not apply.

In various jurisdictions, courts have used the doctrines of "opening the door," "completeness," and "curative admissibility" to determine whether a defendant who attempts to introduce testimony that is related to a previously suppressed identification thereby waives his objections to the introduction of the suppressed identification. For example, in *United States v. Winston,* 447 *F.*2d 1236 (D.C.Cir.1971), the defendant was convicted of assault with intent to commit robbery, assault with a dangerous weapon, and possession of a gun without a license. The sole evidence linking the defendant with the crime was the testimony of the assault victim. *Id.* at 1237. The trial court, in a pretrial order, granted the defendant's motion to suppress the victim's out-of-court identification because the police conducted a lineup without notifying the defendant's attorney about the impending confrontation. *Id.* at

1238. Nevertheless, the court found that the victim's in-court identification of the defendant was untainted. *Ibid.*

During the trial, the defendant, on direct examination, presented an alibi defense. He testified that he had never seen the victim until the date of the preliminary hearing. That was obviously false, because the victim had identified the defendant at an unconstitutional lineup. *Ibid.* The prosecutor argued that the defendant's reference to the preliminary hearing opened the door for rebuttal testimony by the victim concerning the out-of-court identification. *Id.* at 1240. The trial court, with express misgivings, permitted the victim to testify about the lineup at the police station. After the defendant was convicted, the trial judge reconsidered his ruling. He concluded that the admission of the rebuttal testimony, though erroneous, was not prejudicial error. *Id.* at 1241.

On appeal, the D.C. Circuit held that the victim's rebuttal testimony was not admissible on the theory of "opening the door" and that the admission of the testimony was prejudicial error. *Id.* at 1240. According to the court, the mere testimony by the defendant that he had never seen the victim prior to the preliminary hearing did not "open the door" to the government's introducing testimony about facts that were excluded on direct because of a denial of constitutional rights. *Ibid.* The D.C. Circuit stated:

> The [opening the door] doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice. Introduction of otherwise inadmissible evidence under the shield of this doctrine is permitted "only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." *California Ins. Co. v. Allen,* 235 F.2d 178, 180 (5th Cir.1956).

[*Ibid.*]

The D.C. Circuit declared that in view of the constitutional rights involved, a trial court must be particularly careful in permitting the use on rebuttal of pretrial identifications that are otherwise inadmissible because of constitutional violations. *Ibid.* "In a case of constitutionally-grounded exclusion, there is a requirement of clear showing of prejudice before the open-the-door rule of rebut-

tal may be involved." *Ibid.* The panel then concluded that the possibility of prejudice from the defendant's testimony about when he first saw the victim was minimal, and did not justify the prejudice of admitting rebuttal testimony that established a viewing that occurred in violation of the defendant's constitutional rights. The D.C. Circuit declared that the trial court's error could not be considered non-prejudicial beyond a reasonable doubt. *Id.* at 1242.

The Seventh Circuit Court of Appeals confronted the same issue in *United States v. Johnson,* 502 *F.*2d 1373 (7th Cir.1974), *cert. denied,* 420 *U.S.* 977, 95 *S.Ct.* 1402, 43 *L.Ed.*2d 657 (1975), in which the defendant was convicted of robbing a United States post office. Prior to the defendant's arrest, two postal clerks made photographic identifications of the defendant. *Id.* at 1374. After the defendant was arrested, the same postal clerks participated in a lineup. However, the police records did not indicate that a positive identification had been made by either witness at the lineup. *Id.* at 1375. Prior to the trial, the district court granted the defendant's motion to suppress the photographic identifications because the photographic montage was shown to be impermissibly suggestive. *Ibid.* The defense did not attempt to suppress the lineup confrontation, presumably because one of the witnesses picked a person other than the defendant during the lineup. *Ibid.*

During the trial, the prosecutor did not inquire on direct examination into any eyewitness identification. However, on cross-examination, the defense was able to elicit from one of the eyewitnesses that she had been unable to identify the defendant during a pretrial lineup. *Ibid.* On redirect examination, the prosecutor was permitted to elicit from the witness that she made a photographic identification of the defendant.

The defendant appealed, arguing that the district court erred in permitting the prosecutor to inquire on redirect about the suppressed photographic identification. The Seventh Circuit affirmed the trial court's decision to allow the prosecutor to explore, in

rebuttal, testimony that was not admissible on direct in order to prevent prejudice. *Id.* at 1376 (citing *Winston, supra,* 447 *F.*2d at 1240). The court reasoned that the defense counsel, in cross-examining the eyewitness, "opened the door" on the issue of all pretrial identifications made by that witness. The Seventh Circuit acknowledged that "[t]he doctrine of curative admissibility has been specifically held to permit rebuttal use of pretrial identifications that are otherwise inadmissible because of constitutional violations." *Ibid.* (citing *Winston, supra,* 447 *F.*2d at 1240; *United States v. Clark,* 294 *F.Supp.* 44 (D.D.C.1968)).

Although the Seventh Circuit held that the district court did not err in allowing the prosecutor to explore, in rebuttal, identification testimony that was not admissible on direct, the court severely restricted the type of rebuttal testimony that would be allowed. The panel made clear that the doctrine of curative admissibility should not be used to inject prejudicial evidence. In particular, the court observed that the district court was correct in severely restricting the Government's use of the suppressed evidence. For example, the eyewitness was not allowed to testify about the details of the identification or even whom she had identified. She could testify only that on some occasion she made an identification of the person who robbed the post office. When another witness, on redirect examination, mentioned the name of the person identified, the answer was stricken from the record and the court admonished the jury not to consider it. *Ibid.*

Similarly, in *State v. Benoit,* 126 *N.H.* 6, 490 *A.*2d 295 (1985), the Supreme Court of New Hampshire found that the trial court had erred in ruling that the defendant would open the door for inquiry into a previously excluded lineup identification if he questioned the victim about her misidentification on the day of the crime. In *Benoit, supra,* the defendant was charged with armed robbery. On the same day as the robbery, the victim failed to identify the defendant as the perpetrator of the crime. However, six months later, the victim identified the defendant in a lineup. *Id.* at 305. The defendant made a pretrial motion to suppress any

testimony regarding the lineup and any in-court identification resulting therefrom, arguing that the lineup was impermissibly suggestive. The trial court agreed and suppressed any out-of-court or in-court identification by the victim. *Ibid.*

At trial, counsel for the defendant sought to question the victim about her inability to identify the defendant on the date of the crime. As in this case, defense counsel asked the court for a ruling, in the nature of a motion *in limine,* that he would not open the door for inquiry into the lineup that had been suppressed if he questioned the victim about her misidentification. *Ibid.* The trial court stated that "if you inquire into one specific area, the matter is then opened up and it would be unfair to preclude the State on redirect examination from inquiring into other identifications." *Ibid.* Defense counsel noted for the record that he would not question the victim about the misidentification because of that ruling.

The New Hampshire Supreme Court reversed. Although the court acknowledged the general rule permitting misleading evidence to be countered with previously suppressed or otherwise inadmissible evidence, the court held that the defendant had not attempted to elicit misleading evidence. *Ibid.* The court reasoned that because the victim was, in fact, unable to identify the defendant on the date of the crime, it was appropriate for the defendant to elicit this testimony from the victim. However, the court did not believe that such an inquiry would open the door to the State inquiring into other identifications on redirect examination. The court stated:

Had the State been permitted to elicit testimony regarding the line-up, it would have left the jury with the impression that the witness could positively identify the defendant despite the fact that the identification had been deemed unnecessarily suggestive and therefore unreliable. The fact that the door has been opened does not, by itself, permit all evidence to pass through. "The doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice." *United States v. Winston,* 447 *F.*2d 1236, 1240 (D.C.Cir.1971).

[*Id.* at 306.]

The New Hampshire Supreme Court then determined that the trial court's ruling constituted reversible error. In reaching that conclusion, the court emphasized two points: (1) an accused has a constitutional right to cross-examine witnesses to impeach their credibility; and (2) the defendant's right to due process of law protects him from the introduction of evidence of an identification ruled unreliable because it resulted from impermissibly suggestive police procedures. Because the court found that the trial court's ruling had, in effect, forced the defendant to relinquish his fundamental right to cross-examination in order to protect his right to due process of law, it held that the error was not harmless. The court reiterated its belief that " '[t]o require a person to surrender one constitutional right in order to gain the benefit of another is simply intolerable.' " *Ibid.* (quoting *Opinion of the Justices,* 121 *N.H.* 531, 431 *A.*2d 144, 151 (1981)).

V

In the present matter, the trial court similarly committed reversible error by forcing defendant to choose between his right of confrontation and his right to have an unreliable identification suppressed. "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Manson, supra,* 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154. After applying the *Manson, supra,* two-prong test to determine the admissibility into evidence of an eyewitness's identification, the trial court determined that the police procedures used were so impermissibly suggestive that there existed a "very substantial likelihood of irreparable misidentification." Thus, the trial court took the unusual step of ruling that both the victim's out-of-court and in-court identifications were inadmissible. Once the trial court determined that the victim's identification of defendant was patently unreliable, it was error for the court to conclude that the jury would be able to consider such evidence for substantive purposes. If the State were permitted to elicit testimony regarding the identification of defendant, it would have left the jury with the

impression that the victim could positively identify defendant when in reality the trial court determined that the identification was unreliable.

 Although truth is a fundamental goal of our legal system, "various constitutional rules limit the means by which government may conduct this search for truth, in order to promote other values embraced by the Framers and cherished through our Nation's history." *James v. Illinois*, 493 *U.S.* 307, 311, 110 *S.Ct.* 648, 651, 107 *L.Ed.*2d 676, 682 (1989). In his concurrence in *James, supra,* Justice Stevens observed that "In sum, our cases show that the introduction of testimony contrary to excluded but *reliable* evidence subjects the testimony to rebuttal by that evidence." *Id.,* 493 *U.S.* at 324, 110 *S.Ct.* at 658, 107 *L. Ed.*2d at 691 (Stevens, J., concurring) (emphasis added). On occasion, our commitment to preventing the State from presenting unreliable or illegally obtained evidence has meant that a defendant's misrepresentation of the facts of his case would not be subject to rebuttal. For example, in *State v. Davis,* 67 *N.J.* 222, 337 *A.*2d 33 (1975), *cert. denied,* 425 *U.S.* 943, 96 *S.Ct.* 1684, 48 *L.Ed.*2d 187, (1976), we reversed a conviction for armed robbery, holding that a voluntary statement of the defendant taken in violation of *Miranda* could not be used to rebut the testimony of an alibi witness. Although it is important to promote the fact-finding goals of criminal trials, we should not do so at the expense of a defendant's due process rights.

 In this case, defendant had a right to introduce the victim's testimony to establish that another person was identified as the carjacker and that the description that the victim gave to the police did not match defendant. Defendant attempted to establish a sound defense by introducing evidence supporting an alternative rendition of the facts. The victim's initial choice of someone else's photograph suggests that some other person may have been the perpetrator: "Selection of the picture of a person other than the accused ... will be useful to the defense in precisely the same manner that the selection of a picture of the

defendant would be useful to the prosecution." *United States v. Ash,* 413 *U.S.* 300, 318–19, 93 *S.Ct.* 2568, 2578, 37 *L.Ed.*2d 619, 632 (1973). Evidence that someone other than defendant was identified as the perpetrator is highly relevant to the issue of defendant's guilt, and thus the exclusion of such exculpatory evidence infringes on the fundamental right of an accused to present witnesses in his own defense. *Pettijohn, supra,* 599 *F.*2d at 480; *accord Washington v. Texas,* 388 *U.S.* 14, 19, 87 *S.Ct.* 1920, 1923, 18 *L. Ed.*2d 1019, 1023 (1967). That right gains enhanced importance when the evidence is critical to an accused's defense. *Chambers, supra,* 410 *U.S.* at 302, 93 *S.Ct.* at 1049, 35 *L. Ed.*2d at 312–13.

The State argues that allowing defendant to present evidence that the victim identified another person as the perpetrator, without also admitting into evidence that the victim subsequently retracted his original identification and description, could have conveyed to the jury the misleading impression that the victim made a reliable identification of another perpetrator. We agree. However, the trial court erred when it held that the State could, in rebuttal, present the jury with *"the full panoply* of what took place by way of identification of the individual with the gun." The doctrine of opening the door can be used only to prevent prejudice; it cannot be subverted into a rule for injection of prejudice. *Winston, supra,* 447 *F.*2d at 1240. By not carefully limiting the State's use of the suppressed evidence, the trial court created a situation that forced defendant to choose between his right to cross-examination and his due process right to be protected from the introduction of unreliable identification evidence. *See Avant v. Clifford,* 67 *N.J.* 496, 539, 341 *A.*2d 629 (1975). Requiring defendant to trade one constitutional protection for the ability to exercise another constitutional right was error. Instead, the court should have allowed the State to explore, in rebuttal, limited amounts of the suppressed evidence.

Permitting defendant to question the victim about his initial misidentification and description of the perpetrator does not

mean that the State is without recourse to prevent the jury from being misled into believing that the victim made a reliable identification of another person as the perpetrator. Although the State should not have been allowed to introduce evidence that the victim identified defendant, the State could have introduced limited amounts of the suppressed evidence without violating defendant's due process rights. For example, the victim could have testified during redirect examination that he had identified more than one individual as the person who carjacked him. The victim need not testify about the details of the identification or whom he identified in order to rebut defendant's implication that the victim made a reliable identification of another person as the culprit. Permitting such limited redirect examination would have removed any unfair prejudice that might otherwise have ensued from defendant's cross-examination of the victim, without injecting inadmissible evidence into the trial.

An accused's right to due process of law protects him from the introduction of an identification that is determined to be patently unreliable because it was the result of unduly suggestive police practices. *Simmons, supra,* 390 *U.S.* 377, 88 *S.Ct.* 967, 19 *L.Ed.*2d 1247; *Madison, supra,* 109 *N.J.* at 229, 536 *A.*2d 254. A defendant also has a constitutional right to confront witnesses against him. *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10. When the trial court ruled that defendant would open the door completely to the introduction of the suppressed identification if defendant cross-examined the victim about his description of the culprit and misidentification, the court forced defendant to choose between his right of confrontation and his right to due process of law. The court's ruling constitutes reversible error, and requires reversal of defendant's conviction.

## VI

Because we reverse defendant's conviction, we need not reach the issue whether Luis Vincent's testimony that he knew defendant intended to take the car because "he's that kind of person"

constitutes reversible error. We observe, however, that because Vincent's statement implied that defendant had a propensity to commit crimes, the trial court should have explained to the jury the effect of the State's withdrawing the question and provided the jury with a curative instruction.

The judgment of the Appellate Division is reversed and the matter remanded to the Law Division for a new trial in accordance with the opinion of the Court.

*For reversal and for remandment*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.