**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4223-15T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

OWEN R. HARSHANEY,

    Defendant-Appellant.

_____

Submitted April 24, 2018 — Decided  August 6, 2018

Before Judges Reisner, Hoffman, and Gilson.

On appeal from Superior Court of New Jersey,
Law Division, Somerset County, Indictment No.
13-07-0387.

Joseph E. Krakora, Public Defender, attorney
for appellant (Margaret R. McLane, Assistant
Deputy Public Defender, of counsel and on the
briefs).

Michael  H.  Robertson,  Somerset  County
Prosecutor, attorney for respondent (Paul H.
Heinzel, Assistant Prosecutor, of counsel and
on the brief).

PER CURIAM

    In connection with a fire set at his former girlfriend's

home, defendant Owen Harshaney was indicted on three counts of

first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3, and three counts of second-degree aggravated arson, N.J.S.A. 2C:17-1(a)(1). A jury acquitted defendant of attempted murder and second-degree arson, but convicted him of three counts of third-degree arson, N.J.S.A. 2C:17-1(b)(1). The trial court sentenced defendant to five years in prison for each count, but ordered that the sentences be served concurrently.

On this appeal, defendant challenges the conviction and the sentence. He presents the following points of argument:

> POINT I: THE POLICE DETECTIVE'S TESTIMONY ABOUT OBTAINING A WARRANT AND EXPLAINING WHY HE DID NOT SPEAK TO DEFENDANT BEFORE HIS ARREST WAS HIGHLY PREJUDICIAL AND VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS. (Not Raised Below)
>
> POINT II: BECAUSE ONLY ONE FIRE WAS SET, MERGER IS REQUIRED.
>
> POINT III: THE STATUTORY MAXIMUM SENTENCE FOR THIS THIRD-DEGREE CRIME IS MANIFESTLY EXCESSIVE.

Based on State v. Cain, 224 N.J. 410 (2016), which was decided after the trial in this case took place, we conclude that defendant's conviction must be reversed and the matter remanded for retrial. In particular, a police witness's repeated references to the State obtaining "warrants" based on "probable cause" and other similar prejudicial testimony - plus the absence of any

curative instruction - amounted to plain error. R. 2:10-2; Cain, 224 N.J. at 414.[1]

I

To illustrate our legal conclusions, it is necessary to review the evidentiary record in some detail. The State presented undisputed evidence that the fire, which occurred on March 22, 2013, at a house on Brandywine Rise in Green Brook, was the result of arson. Although the ex-girlfriend, M.M.,[2] was not at home at the time of the fire, testimony from three of her family members, who were at home, established that they were asleep at about 4:00 a.m. and woke up to find that the house was on fire. Testimony from forensic witnesses established that the fire was intentionally set, by pouring gasoline next to the exterior of the house and igniting it. The fire was set on the west side of the house, where M.M.'s bedroom was located. All three family members were able to escape from the burning house.

---

[1] As noted later in this opinion, while we vacate the conviction and sentence, we reinstate the "no-contact" condition under which defendant was originally released pending trial in this case. Defendant's pending motion, seeking permission to file a supplemental brief addressing the imposition of a permanent no-contact order, is denied as moot.

[2] We use initials and first names to protect the privacy of M.M. and her family.

3

The central issue in the case was whether defendant set the fire. Defendant's family lived in Dunellen, a mile or two from M.M.'s home in Green Brook. M.M. and defendant had a dating relationship for several years while they were in high school. Defendant was also friendly with M.M.'s family. According to M.M.'s father, defendant used to plow the M. family's driveway during the winter.

M.M. testified that at the end of their senior year of high school, she told defendant that she wanted to end their relationship. He wanted to continue the relationship, however, and she continued to see him sporadically during their freshman and sophomore years of college. M.M. attended Rutgers University in New Brunswick, while defendant attended Rutgers Newark. She would occasionally drive to Newark to visit him.

At some point during their sophomore year of college, M.M. broke off the relationship and blocked defendant's calls on her cell phone. However, during their junior year in college, M.M. received a text message from defendant and realized that his cell number was no longer blocked. She admitted that his message was innocuous, and she took no action to block his number again. She initially testified that she did not hear from defendant again until March 2013, when she was a senior in college.

That contact, which sparked the events surrounding this case, occurred after midnight on March 22, 2013. At that time, M.M. was at a bar in Freehold with her current boyfriend, Ralph, and two of their friends, Dan and James. At about 12:45 a.m., M.M. received a text message from defendant. M.M.'s friends reacted to the text with extreme disapproval, after she told Ralph that she did not want to hear from defendant. Unprompted, Dan took M.M.'s cell phone, and started sending defendant text messages, telling him to leave Ralph's girlfriend alone and threatening to come up to Newark and fight him. Then James texted defendant his cell number and told defendant to call him. M.M. overheard her friends and defendant yelling at each other over James's cell phone, and threatening to kill each other. Ultimately, against M.M.'s wishes, she and her three companions drove to Newark in Dan's truck. However, according to M.M., when they reached Newark, she became very upset and succeeded in convincing the men to leave Newark without confronting defendant.

On cross-examination, M.M. admitted that, as recently as January 10, 2013, defendant had text messaged her with an offer to plow the driveway of her family's home after a snow storm. She responded by thanking him but stating that it was not a priority. She conceded that at that point, there was no animosity between

them, and the text was not unwelcome. M.M. admitted that she also occasionally encountered defendant at Rutgers football games.

M.M. further acknowledged that defendant's initial text message to her on March 22, 2013 was "kind of . . . innocent." However, Dan's response, which he typed on her cell phone, was a string of hostile comments, threats, and obscenities. In his responding text message, defendant stated, "I don't know what I did . . . I don't know what you're talking about." M.M. was unable to explain how her companions knew that defendant lived in Newark or what his address was. She also could not recall if she saw defendant in Newark, before her group decided to leave Newark.

According to Ralph's testimony, when M.M. received the text message on March 22, she seemed annoyed and told her companions that the person who sent it would not "leave her alone." At that point, Dan took it on himself to send a series of text messages, telling defendant that he knew where defendant lived and ordering him to leave M.M. alone. Their friend James then sent defendant a text message with James's phone number, telling defendant to call him. This triggered a series of hostile phone conversations, during which defendant exchanged threats with Ralph and James. Ralph could not explain why the group decided to go to Newark in search of defendant. He stated that they had not really thought it through. On cross-examination, he conceded that M.M. told her

companions where defendant lived, knowing that they intended to go to Newark to pick a fight with defendant. Like M.M., Ralph denied seeing any police cars in Newark, and testified that the group left Newark at M.M.'s insistence.

In his testimony, Dan explained that their friend James was a very emotional person, who was "screaming violently" during his phone conversations with defendant. Dan testified that when the group reached Newark, he had a cell phone conversation with a second person, who was with defendant. This person was calm and asked Dan to help him end the conflict. At that point, Dan decided to end the incident and leave Newark with his companions. On cross-examination, Dan conceded that the calm person on the phone sounded like a police officer, which influenced his decision that the group should leave Newark. According to Dan, there were no further phone calls or text message exchanges with defendant during the ride home.

James testified that he had a series of hostile phone conversations with defendant, in which each of them made threats to "fight" and "kill" the other. He explained that he and his male companions went to Newark intending to fight defendant. According to James, defendant told James what street he lived on, and invited James and his group to come up and fight with defendant and his group. James testified that between 2:00 a.m. and 3:00

7

a.m., he received a call from a much calmer person, who also spoke to Dan and convinced Dan that the group should go home. James testified that his cell phone received a call from defendant's phone number at 2:59 a.m., which James did not pick up, and another at 4:30 a.m., which he missed because by then he was at home, asleep.

Defendant's friend Timothy testified that a few minutes after 2:00 a.m. on March 22, 2013, defendant called Timothy to express concern that "his ex-girlfriend's new boyfriend" might be looking for him, intending to get into a fight. Like defendant, Timothy was from Dunellen. However, he was temporarily living in Bayonne. Defendant asked Timothy to come to his Newark apartment from Bayonne to help him. When Timothy arrived, fifteen or twenty minutes later, defendant pulled up in a large black pickup truck and parked near him. Defendant was calm but upset about the possibility of a fight. Shortly after Timothy arrived, a Rutgers University police officer drove up, and defendant walked over to speak with him. As defendant was talking to the officer, a white truck entered the street and approached them from about fifty yards away. Defendant appeared to recognize the truck and pointed it out to the officer. According to Timothy, at that point, the white truck turned down a side street, and the police officer

drove off in pursuit. Defendant and Timothy got into defendant's truck and started following the police car.

During the ride, Timothy heard defendant talking to someone on his cell phone about having a fight. Timothy testified that he did not want to be involved in a fight. Using defendant's cell phone, he had two cell phone conversations with one of the people defendant had been talking to; Timothy encouraged that person and his companions to "just go home." Timothy testified that those conversations were "calm." He and the other person agreed that "it's late, this is dumb, nothing good can come of fighting" and agreed that they would all go home.

According to Timothy, at that point, defendant was "[a]cting pretty calm." When they returned to Halsey Street, where defendant's apartment was located, Timothy offered to drive defendant back to Dunellen. Defendant told Timothy that he wanted to retrieve a TV stand from his Newark apartment, but he first needed to drive back to his family's home in Dunellen because he left his apartment key there.[3] Timothy drove back to Bayonne, but called defendant to make sure he got home to Dunellen safely. He also testified that at about 4:20 a.m., defendant's parents called

---

[3] M.M. testified that March 22, 2013 was during the Rutgers University spring break.

him, using defendant's cell phone. Timothy identified a photo of the black truck defendant was driving that night.

Despite the nasty phone calls and text messages between defendant and M.M.'s male companions, the State did not produce any evidence that defendant made any threats against M.M. or that he was angry with her.

A couple of days after the fire, the police recovered security videos from a drug store and a car repair business in the area of M.M.'s home in Green Brook. The drugstore video showed a dark pick-up truck entering Route 22 West, about a half mile from M.M.'s neighborhood, at 3:54 a.m. The car repair video showed the same pick-up truck exiting Route 22 West at 3:57 a.m. and turning onto Cramer Avenue, a side street leading to Brandywine Rise. At 4:03 a.m., the video showed the same truck emerging from the neighborhood, "traveling towards [Route] 22, with its lights off." Near the intersection with Cramer Avenue and Route 22, the truck's headlights went on and the truck turned onto westbound Route 22. The video also showed the police arriving from Route 22 westbound, at 4:07 a.m. The officer who testified about the video admitted that the most direct route from Brandywine Rise to defendant's family's home in Dunellen was to go east on Route 22, not west.

Captain Schutta testified about his investigation of the fire. He confirmed that defendant was issued a ticket, after a

red light camera showed his black pick-up truck going through a red light in Newark on March 22, 2013, at 3:17 a.m. He also testified that he obtained a communications data warrant for a certain cell phone number (later confirmed as defendant's cell phone), after learning that M.M. had received "annoying or bothersome texts" from defendant. He explained that a judge had issued the warrant after reviewing an "affidavit" and an application. Schutta also confirmed that "by way of a Grand Jury subpoena" he obtained defendant's bank records and determined that defendant paid the ticket. The red light video showed defendant's black pick-up truck. Prompted by the prosecutor, Schutta then testified that he obtained "an arrest warrant for [d]efendant for aggravated arson" and arrested him on May 17, 2013.

There was no objection to any of that testimony. On the other hand, the trial court did not issue any limiting instruction explaining to the jury that neither a communications data warrant nor an arrest warrant was evidence of defendant's guilt. Moreover, Schutta's testimony about the "annoying or bothersome texts" implied to the jury that the police had incriminating evidence beyond that which the State had introduced at the trial. His statement implied that M.M. had received other text messages from defendant, in addition to the one admittedly "innocent" message defendant sent her on March 22.

Schutta testified that when defendant was arrested, the police seized his cell phone. When defendant went through the booking process, he was asked for pedigree information including his phone number, and he gave the number of the phone from which text messages had been sent to M.M. on March 22.

The prosecutor then elicited from Schutta a long explanation as to why he did not arrest defendant earlier than May 17, 2013, and why he did not search defendant's truck or seize his clothing and look for evidence of gasoline. Schutta explained that the police did not have "probable cause" to apply for a search warrant. He also explained that the police did not want to ask defendant for consent to search his truck until they had "significant probable cause to make an arrest." He also made multiple other references to "probable cause" to apply for an arrest warrant.

In the course of his testimony, Schutta also testified that defendant became "a person of interest" when the police "learned from [M.M.] about the unwanted text messages." Again, Schutta implied that there had been a history of inappropriate text messages, when in fact defendant only sent M.M. one text message, on March 22. Additionally, in explaining, at length, how the police obtained "probable cause" to obtain a search warrant, Schutta implied to the jury that a judge had favorably evaluated the State's case. His comment about "significant probable cause

12

to make an arrest" also implied to the jury that the police had evaluated the evidence and believed defendant was guilty.

At one point, the trial judge observed at side bar that Schutta's thought processes and investigation strategies were not relevant and the references to "probable cause . . . could be prejudicial." The judge warned the prosecutor to "stay away from having [Schutta] testify about legal conclusions." However, the judge did not issue a curative or limiting instruction to the jury.

On cross-examination, Schutta conceded that the Sprint "reveal records," concerning the location of cell phones, had a disclaimer indicating Sprint does not guarantee the accuracy of the location information. Schutta was also confronted with the red light video, and asked if it showed Yankees and Giants stickers on defendant's truck. He responded that there was "something there, hard to decipher, but there's something there." He later admitted that there were stickers on the truck.

Schutta was also confronted with one of the security videos, showing that when the dark truck's lights turned on as it was leaving M.M.'s neighborhood, an entire bar of lights illuminated on its roof. He conceded that in a photo of defendant's truck, there were no lights on the roof. He first insisted that on the video from the red light camera there was "something" on the roof

of the cab.  However, when shown the video, he admitted there was no light "fixture" on the roof of the truck.

On redirect examination, Schutta essentially admitted that he could not say that the truck in the red light camera video was the same as the truck on the car repair security video taken near M.M.s neighborhood.[4]  He admitted that he could tell "it's some type of truck.  Other than that, I don't know." He also admitted that he could not "discern any type of color similarity" because it was "at night, they're dark, it's dark out."

The State's final witness was FBI Special Agent Eric Perry, an expert in the field of cellular site analysis, and a member of the Bureau's cellular analysis survey team (CAST).  Perry testified that he was able to trace the movement and location of defendant's cell phone in the early morning hours of March 22, 2013, based on calls and texts made to and from the phone.  He testified that defendant's initial text to M.M., just before 1:00 a.m., came from Dunellen.  Later texts and phone calls came from Newark, near Halsey Street and near the red light camera.  Perry also traced defendant's route from Newark back to Dunellen, from 3:18 a.m. and

---

[4] The prosecutor was trying to get Schutta to explain why it might be hard to tell if the lights on the vehicle in one video were different from the lights on the vehicle in another video.

3:43 a.m., based on communications between defendant's cell phone and cell phone towers along Route 78.

Perry further testified that by using a method called triangulation, he was able to place defendant's cell phone in the area of M.M.'s house on Brandywine Rise between 3:59 a.m. and 4:02 a.m. on March 22, 2013. He testified that he verified the information by conducting a drive test to see which cell towers served that neighborhood. Perry also conducted a drive test for the location of defendant's home in Dunellen. He testified that defendant's cell phone could not have been in that location between 3:59 a.m. and 4:02 a.m., because that area of Dunellen is not served by the cell towers with which the phone was in contact in that timeframe.

On cross-examination, Perry admitted that his test drives took place in April 2014, in the afternoon hours, while the historical events took place almost a year earlier around 4:00 a.m. He admitted that usage in the area at a particular time of day could affect which cell tower a cell phone would contact. Perry did not know if any of the towers had been repaired to increase their signal strength in the year before his test drive. He also conceded that determining a cell phone's location at any particular time could depend on whether it was stationary or whether it was in a moving car and how fast the car was moving.

Perry conceded he could not say that, at any one point in time, defendant's cell phone "was actually at" any specific location. Perry also agreed with defense counsel's statement that Perry's "[FBI] unit never says someone's in this particular location unless you're doing an active pinging of them at that moment." In other words, Perry's methodology in this case was not as precise as it appeared to be during his direct testimony. Perry also admitted that the time on the car repair surveillance video may have been inaccurate, as compared to the time reflected in the phone company's records. However, on redirect, he asserted that he was confident that defendant's cell phone was in the vicinity of Brandywine Rise between 3:58 and 4:02 a.m. on March 22, 2013.

In his summation, the prosecutor once again repeated the improper information from Schutta's testimony, telling the jury that defendant was angry on March 22, because his "efforts to get back together with [M.M.] and constantly texting her" were "exposed" after he sent M.M. the text message on March 22. There was no evidence that defendant was "constantly texting" M.M., and there was no evidence that he was trying to "get back together" with her.

## II

For the first time on appeal, defendant contends that the repeated references to search warrants and arrest warrants were

A-4223-15T2

irrelevant and prejudicial, and the trial court erred in failing to give the jury a limiting instruction. We review this issue for plain error. State v. Ross, 218 N.J. 130, 142-43 (2014). That is, we consider whether the error "is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. In applying that standard, we must determine whether the claimed error was "sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." State v. Prall, 231 N.J. 567, 581 (2018) (quoting State v. Daniels, 182 N.J. 80, 95 (2004)) (alteration in original).

Defendant's argument relies heavily on Cain, which was decided after the trial concluded. In Cain, as in this case, the prosecutor repeatedly elicited testimony about the issuance of search warrants:

> Throughout the course of the trial, the prosecutor repeatedly referenced that the search of defendant's residence was authorized by a warrant issued by the court. In his opening statement, the prosecutor told the jury that "[a] search warrant was then obtained, authorized by a Superior Court judge." The prosecutor returned to that theme, stating that information about the drug transactions with Hinson and Beckham was included in "an affidavit for a search warrant" and that "[a] search warrant [was] brought to a judge" because "[b]efore you can go into somebody's home under those circumstances, you need the authority of a Superior Court judge." In the course of questioning witnesses, the prosecutor

> repeatedly elicited that a warrant was secured to search defendant's residence and occasionally elicited that a Superior Court judge issued the warrant.
>
> [Cain, 224 N.J. at 416 (alterations in original).]

Referring to its previous decision in State v. Marshall, 148 N.J. 89, 240 (1997), the Court confirmed that a prosecutor may appropriately "convey to the jury that the police were authorized" to conduct a search, so the jurors are not left with the impression that the police acted unlawfully. Cain, 224 N.J. at 433. However, the Court cautioned that "repeated statements that a judge issued a search warrant for a defendant's home — when the lawfulness of the search is not at issue — may lead the jury to draw the forbidden inference that the issuance of a warrant by a judge supports the rendering of a guilty verdict." Ibid. The Court found that "[t]he constant drumbeat that a judicial officer issued a warrant to search defendant's home had little probative value, but did have the capacity to lead the jury to draw an impermissible inference that the court issuing the warrant found the State's evidence credible." Id. at 436.

The Court noted with approval the holding in State v. Alvarez, 318 N.J. Super. 137 (App. Div. 1999), in which we reversed the defendant's conviction based on multiple improper references to

an arrest warrant and a search warrant. <u>Cain</u>, 224 N.J. at 434 (citing <u>Alvarez</u>, 318 N.J. Super. at 147); <u>see also</u> <u>State v. Milton</u>, 255 N.J. Super. 514, 519-21 (App. Div. 1992) (reversing the defendant's conviction due to improper references to a search warrant).

In this case, the prosecutor first told the jury about the issuance of warrants in his opening statement. He then continued the theme at considerable length during the testimony of Captain Schutta. As we previously described, the prosecutor repeatedly elicited improper, irrelevant, and prejudicial testimony about a judge issuing a warrant based on "probable cause," and about the police determining that they had "strong probable cause" to obtain an arrest warrant. All of that testimony would naturally communicate to the jury that the police had decided that defendant was guilty, and that a judge had favorably evaluated the State's evidence. Because the trial court did not issue a limiting instruction, or explain the concept of probable cause, the jury may have formed an exaggerated and inaccurate view of the testimony's significance. <u>See</u> <u>Alvarez</u>, 318 N.J. Super. at 148.

The repeated references went far beyond any need to assure the jury that the police acted lawfully. As a result, the State misplaces reliance on <u>Marshall</u>, and on other cases involving only brief references to a warrant. <u>See</u> <u>State v. Williams</u>, 404 N.J.

Super. 147, 168 (App. Div. 2008); State v. McDonough, 337 N.J. Super. 27, 32-35 (App. Div. 2001).

The State contends that defendant opened the door to the testimony by attacking the thoroughness of the police investigation. We disagree.

> The "opening the door" doctrine is essentially a rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that generates an issue, or (2) inadmissible evidence admitted by the court over objection. The doctrine of opening the door allows a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of related evidence.
>
> [State v. James, 144 N.J. 538, 554 (1996).]

The doctrine "has its limitations." Ibid. For example, the trial court may exclude evidence when its probative value is substantially outweighed by the risk of undue prejudice or where it may mislead the jury. Ibid. (quoting N.J.R.E. 403).

In this case, the State presented testimony that the police had obtained a search warrant to obtain M.M.'s father's clothing and tested it for gasoline, because the father was in the house at the time of the fire. Defense counsel asked the witness if the police had obtained a search warrant "to take any other clothing items at all in the investigation." The witness replied that they had not. Defense counsel's questions inferentially placed before

the jury the fact that the police never tested defendant's clothing for accelerants. However, the defense did not focus on the thoroughness of the police investigation, and defense counsel did not make "unfair prejudicial use" of information about the investigation. James, 144 N.J. at 554.

In the context of this case, the reason why defendant's clothing was not tested was of minimal relevance. Defense counsel's limited questioning did not give the State license to present the extensive, highly prejudicial testimony elicited from Schutta. See Cain, 224 N.J. at 436 (citing N.J.R.E. 403). Indeed, the trial judge recognized the potentially prejudicial nature of the information, but did not give a curative instruction.

This was not a clear-cut case. The State's evidence was not overwhelming. The improper references to the judicial approval of the warrants, and the State's "strong probable cause," could have made a difference to the outcome. See R. 2:10-2. In addition, both Schutta and the prosecutor made inaccurate references to defendant sending M.M. repeated unwelcome text messages, when there was no evidence to support that assertion. It is improper for the prosecution to give the jury the impression that the State has additional incriminating evidence that the jury has not heard. See State v. Bankston, 63 N.J. 263, 271 (1973).

On the morning of the fourth day of deliberations, the jury announced that they had reached an impasse. After the judge sent them back to continue deliberating, they reached a verdict. However, we cannot overlook the distinct possibility that the jury's evaluation of the evidence was tainted by the repeated improper testimony and comments.

Viewing the record as a whole, we find that the repeated references to search warrants, an arrest warrant, and probable cause, with no curative instruction from the trial court, had a clear capacity to produce an unjust result. See R. 2:10-2; Alvarez, 318 N.J. Super. at 148; Milton, 255 N.J. Super. at 520-21. Thus, we reverse defendant's conviction, vacate the sentence, and remand this case for a retrial.

We are aware that while this appeal was pending, defendant served a portion of his prison term, and he was recently released on parole with a list of conditions including no contact with M.M. or her family. Because we have reversed defendant's conviction, we also vacate his sentence including his parole supervision. However, we reinstate the original "no-contact" condition under which defendant was previously released pretrial. Thus, as a condition of his continued release pending the retrial, defendant is to have no contact with M.M. or her family. In continuing that condition, we imply no view as to the merits of the State's case,

but only acknowledge that "no victim contact" is normally included as a condition of pretrial release in these types of cases. On remand, the trial court in its discretion may impose additional conditions of release, if appropriate.

Because we are reversing defendant's conviction, we do not address defendant's sentencing arguments. In the trial court, defendant did not challenge the filing of three arson charges based on his setting one fire. Nor did he raise the merger issue. Should defendant wish to raise a multiplicity argument on remand, he may present that issue to the trial court by filing a motion to dismiss portions of the indictment prior to the retrial.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION