**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2640-17T4
                A-3157-17T4

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

NATHAN INGRAM, a/k/a
NATHANIE INGRAM,
NATHANIEL J. INGRAM,
NATA INGRAM, and
FURQAN SALAAM,

       Defendant-Appellant.

_____

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

ASHLEY D. BAILEY,

       Defendant-Appellant.

_____

Submitted October 21, 2020 - Decided January 8, 2021

Before Judges Alvarez and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 15-11-3407.

Joseph E. Krakora, Public Defender, attorney for appellant Nathan Ingram (Kevin G. Byrnes, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant Ashley D. Bailey (Frank M. Gennaro, Designated Counsel, on the brief).

Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Nancy P. Scharff, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs).

PER CURIAM

Co-defendants Nathan Ingram and Ashley D. Bailey were tried together by a jury over several days in October and November 2017. They now appeal their convictions and sentences; we affirm.

Ingram was found guilty of the following offenses: first-degree leader of a narcotics trafficking network, N.J.S.A. 2C:35-3 (count one); first-degree possession of a controlled dangerous substance (CDS) with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(1) (count two); second-degree conspiracy, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:35-5(b)(1) (count three); first-degree maintaining or operating a CDS production facility, N.J.S.A. 2C:35-4 (count four); eight counts of third-degree possession of a CDS (heroin), N.J.S.A.

2

2C:35-10(a)(1) (counts seventeen, twenty-one, twenty-three, twenty-five, twenty-seven, thirty-one, thirty-five and thirty-seven); eight counts of third-degree distribution of a CDS (heroin), N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(3) (counts eighteen, twenty-two, twenty-four, twenty-six, twenty-eight, thirty-two, thirty-six, and thirty-eight); third-degree possession of a CDS (cocaine), N.J.S.A. 2C:35-10(a)(1) (count thirty-nine); third-degree distribution of a CDS (cocaine), N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(3) (count forty); and second-degree possession of a weapon during a CDS offense, N.J.S.A. 2C:39-4.1 (count 102).

Ingram's aggregate sentence is life imprisonment plus ten years, subject to thirty years of parole ineligibility. The trial court appropriately merged certain counts and sentenced Ingram on January 12, 2018, to a term of life on count one, subject to twenty-five years of parole ineligibility, and a consecutive ten-year prison term with five years of parole ineligibility on count 102. The judge imposed terms concurrent to each other and count one as follows: twenty years with ten years of parole ineligibility on count two; ten years with five years of parole ineligibility on count three; twenty years with ten years of parole ineligibility on count four; five years with two and one-half years of parole

3

ineligibility on counts eighteen, twenty-two, twenty-four, twenty-six, twenty-eight, thirty-two, thirty-six, thirty-eight, and forty.

Bailey was indicted in three counts. The jury acquitted her of second-degree conspiracy to distribute CDS, N.J.S.A. 2C:5-2 (count three), but convicted her of two counts of second-degree official misconduct, N.J.S.A. 2C:30-2(a) (count seventy-two and seventy-three). After the judge denied her motion for a new trial, she was sentenced on January 12, 2018, to eight years of imprisonment subject to five years of parole ineligibility on count seventy-two, and a concurrent seven-year term, subject to five years of parole ineligibility, on count seventy-three. Her aggregate sentence was eight years, subject to five years of parole ineligibility.

## I.

We detail the circumstances that led to the indictment. Between April and October 2014, state and local police conducted "Operation South District," an investigation into a Camden drug ring. The targets included Ingram, his brother Edwin Ingram (Edwin), Edwin's half-brother Fidel Webb, Donyell Calm, Lawrence Brown, and Kareem Anderson.

The investigation began with multiple drug purchases, and the issuance of communication data warrants (CDWs), and wiretap orders for the phones of

Ingram, Calm, and Brown in June 2014. Wiretaps were also established for Webb and Anderson's phones.

Police listened to thousands of conversations and surveilled numerous citizen buys, at times arresting the purchasers. Ingram alone participated in 2838 calls/texts deemed pertinent to the investigation between June 2 and October 19, 2014. Others discovered to be involved in the distribution scheme included: Montell Lee, Tatiana Timmons, Kyiesha Grant, Andrew Colavecchio, Jason Gazzara, Jermaine Calm, Kevin Williams, and Carlos Gutierrez.

Police concluded that Ingram's residence was a "stash house" after synchronized raids on his home and the residences of Grant, Gazzara, Calm, and Colavecchio on October 28, 2014. At Ingram's residence, the authorities found two safes containing heroin and crack cocaine, additional bags of crack cocaine and heroin; drug packaging materials (i.e. wax paper folds, small baggies, a digital scale and an ink stamp); more than seven cell phones; a bag containing pots, blenders and sifters; $782 in cash; two rifles and magazines; a loaded .38 caliber revolver and a Ruger .22 caliber pistol and magazine; and two handgun clips and additional bullets.

While the search was underway, Ingram told police the items being seized were "all [his]," and that everyone in his home and his family "had nothing to

do with it." Ingram later gave a formal statement acknowledging to police that: (1) there had been 500 grams of heroin in his basement; (2) he purchased his drugs from "J.B." in Philadelphia, 200 to 1000 grams at a time; (3) he occasionally purchased uncut powder cocaine from J.B.; (4) all of his money was invested in the drugs; (5) he last purchased drugs from J.B. two months prior; (6) he had accumulated the drugs found in his home "over time"; (7) he purchased the seized weapons from "crack heads" who used to work for him; and (8) Brown was staying at his home. [PIa561-PIa601]. When police told him that they knew Brown was working for him, defendant asked "what the fuck don't [y'all] know."

The search of Grant's home resulted in the seizure of ammunition, three cell phones, a scale, and multiple boxes of drug packaging materials. When police searched the apartment next door to Grant's, they located a large bag containing 978 wax folds of heroin together with a trash bag containing drug paraphernalia. At Gazzara's residence, police found heroin, marijuana, scales, cell phones, ledgers, and packaging materials. From Calm's home, police seized multiple bags of crack cocaine and heroin, wax folds, cell phones, glass vials, and baggies. Marijuana, $10,000, prescription pills, packaging materials, drug

paraphernalia, a ledger, a heat sealer, and a box containing three digital scales were located in Colavecchio's residence. Edwin's home was not searched.

Bailey, a Camden County police officer, was Edwin's wife. On August 13, 2014, police initiated a wiretap on her phone and Edwin's phone. One hundred and thirty-five telephone calls were logged between Bailey and members of the drug organization from June through August 2014, although only six occurred after August 13, 2014. Before the wiretaps commenced, 939 calls were recorded between Edwin and members of the drug organization, but only six after. Edwin was not recorded talking to anyone about drugs.

Bailey accessed investigative reports using the Law Enforcement Advanced Application (LEAA), a computerized database of police reports, during this time. Like every police officer, Bailey used an individual password to log onto the system.

The LEAA log revealed that on June 10, 2014, Bailey accessed a March 31, 2014 report concerning Webb, and a March 26, 2014 arrest report concerning Calm. That same day, she also accessed six reports concerning Edwin, and related events occurring on December 6, 2012, August 6, 2013, November 11, 2013, and March 13, 23, and 26, 2014. On June 19, 2014, Bailey accessed reports concerning Calm dated April 7 and 29, 2014, and May 27, 2014. [8T17-

8T19]. She did not print the reports. Bailey was not officially involved in any aspect of the investigation.

Early in the morning on September 16, 2014, police videotaped a meeting at Ingram's residence attended by Edwin and Webb. Later that morning, police intercepted a phone call between Calm and Anderson during which they stated that Edwin was "scared as hell" because "IA" was "near his crib." That same day, between 4:06 p.m. and 10:03 p.m., Bailey and Edwin exchanged the following text messages:

> [Female]: Don't get yourself all worked up. It's nothing you can change about it, if it's done. We had our chance, even me, to throw in the towel and . . . get free of it all. And I chose you, so I chose my fate. Shit happens. I guess it was just in God's plan. I'm stressed, but it's nothing I can change.
>
> [Male]: It ain't nothing. Don't worry about it. As long as you're not a crooked cop, we'll be good.
>
> [Female]: That's not true. There's more to it than that. I tried so many times to explain how much more that included, but I chose to be here, so I am just as responsible. I promised myself that I wouldn't make it here, but what can I do about it?
>
> [Male]: It ain't even nothing. People just talking. You off?
>
> [Female]: They talking and they thinking up a plan, babe. But no worries. I'm relieved they foo [sic] what I couldn't. A good plan.

[Male]: How long you going to be out?

[Female]: You're not going to believe what I was . . . told tonight.

[Male]: What?

[Female]: It's true.

[Male]: How did that happen?

[Female]: One of the guys working with L3 Narc. Fuck, fuck, fuck. How did I fucking get here? WTF. I am so fucking disappointed with myself. I am so fucking stressed now.

[Male]: What? They know nothing.

[Female]: I don't know what he knows. It's time for me to brace myself. I accept what's for me. I accepted that when I chose you. We chose each other and I'm ready for that battle. I don't care. I chose to love and that's all that matters. You love me and I love you, so let them bring me what I knew would come some day.

[Male]: We gonna be good. Let them watch.

[Female]: I know. If not, we still got each other and that's good enough for me. It's time for you to choose, though. Choose to let us burn or choose to help us beat this. I can't make that decision for us. Look where it got us now. I could use a hug and a foot rub. You up for it?

[Male]: I got us. Watch.

A-2640-17T4

At 5:00 a.m. on October 23, 2014, Sergeant Robert Borger of the CCPD gave a contrived intelligence briefing at a roll call attended by Bailey and one other officer. Borger advised the two officers that: (1) on April 12, 2014, a Quasham Land was shot for the second time that week in a particular area; (2) on April 24, 2014, Calm contacted police and stated that he was driving on Ferry Avenue with two passengers, including A.B., when he spotted Land, whom he believed had stolen $3000 from him, driving in a red SUV; (3) Calm started to follow Land, but then Land pulled over, got out and fired a handgun at Calm; (4) A.B. fired back in self-defense with a nine millimeter handgun; and (5) Land was charged as a result of Calm's statement. Borger told Bailey and her fellow officer that it had just been confirmed that the nine millimeter casing from the April shooting matched casings related to a criminal mischief incident that occurred in front of Calm's house the prior month.

The field activity report for Bailey's patrol car indicated that, after she left the briefing, Bailey stopped at her home for two minutes at 5:50 a.m., returning at 7:25 a.m. for forty-one minutes. At 10:06 a.m., Webb called Calm and asked him if they could meet at the Ferry Avenue train station. Police surveilled and took pictures of the pair's subsequent meeting at 10:25 a.m. and a second meeting around 12:00 p.m.

10

Shortly after meeting with Webb, Calm called a woman who resided out of state, asking about a house for sale across the street from her residence. He told her, "I need to . . . . I got to bail. Like [ASAP], [ASAP]." Calm also called Anderson and told him: "I'm hot like, word up. Somebody just told me I'm hot, . . . I'm being watched . . . . They been watching me since that shit with (indiscernible) . . . . [W]hat added more fuel to the fire you heard . . . . [t]hat day when you came over here . . . [t]hem jawns are linked to the other shit . . . . It's with the same jawns."

Detective Sergeant Keith Moyer, of the New Jersey State Police Intelligence and Criminal Enterprise Section, later explained at trial that the term "jawns" referred to shell casings. Later that same day, Calm spoke again by phone with Anderson, telling him that he already got a different number, that he was "hot," and that the jawns were "filthy dirty."

Police arrested Bailey on October 28, 2014, the day of the drug raids. Moyer was present when Bailey made two statements. She related that she and Edwin had been romantically involved since high school, and had an on-and-off relationship. They lived in a house she owned, along with their children. Edwin did not have a full-time job or help with any household expenses. She wanted him to find work. Bailey claimed that Edwin beat her, and that she had wanted

to tell her supervisor Sergeant John Maddox about the domestic violence, and to finally be free from Edwin.

Bailey admitted that she had accessed the LEAA system and reviewed the reports at issue and knew her activities were discoverable. She claimed she was trying to keep track of Edwin's involvement with Calm, Webb, and Anderson, whom she described as "freaking hoodlums" who sold drugs and engaged in other criminal behavior. She said that Edwin also sold drugs and had been lying to her about his activities. Bailey denied accessing the reports in an effort to gain any benefit for herself or to help the drug organization.

Bailey admitted making telephone calls to some of the codefendants, but insisted she was only trying to reach Edwin, who avoided her calls and, for a period of time, disconnected his phone. She acknowledged making 149 calls to Calm, Brown, and Webb in June and July 2014, and claimed that she did not make any calls to Brown or Webb between July 20 and September 5 because Edwin had told her he was no longer friends with them. She denied that the calls ceased because she learned about the wiretaps.

Bailey acknowledged that when she stopped home after the October 23 briefing, she discussed it, and the investigation into Calm, with Edwin in an attempt to learn more about Edwin's activities. She was angry and may have

mentioned the matching shells. Her intention was not to give anyone a "head[s] up[,]" but knew that Edwin then spoke to Webb, who told Calm the police were "looking at [him]."

Bailey admitted that she had seen Edwin pull drugs bags and paraphernalia out of his pockets but was afraid to report it to police. She also maintained that she did not know exactly what Edwin was "up to" or specific information to report. Edwin had warned her that she was being investigated by internal affairs.

II.

The following facts were developed at trial. Detective Christy DiVito of the CCPD testified that she made undercover drug buys from Ingram and Calm, purchasing heroin, and occasionally crack cocaine, on eight occasions directly from Ingram. Once, Ingram sent Calm in his stead to complete the transaction. She made seven drug buys directly from Calm. On two occasions, Calm arrived in a car driven by Edwin, and once, Calm was accompanied by Brown.

During Moyer's testimony, the prosecutor played both Ingram's statement to police and a significant number of the intercepted calls. Some texts were read as well. Transcriptions of the intercepted calls totaling more than 500 pages were provided to the jury as listening aids. Moyer testified as an expert in drug distribution and electronic surveillance, and interpreted the jargon used during

13

the calls, identified the speakers and otherwise assisted the jury in understanding the import of the calls.

Some of the calls played for the jury revealed defendant Ingram: (1) wanting to talk with Calm; (2) confirming with a customer the particular drugs he had for sale; (3) directing buyers to come to his home to pick up drugs; (4) stating that he would consult with Edwin after a complaint about drug quality; (5) stating that he had a "young boy that hustles for [him]" with the "old work" but that he now had "new work" to give to a complaining customer; (6) advising a supplier that customers were complaining and that he needed to provide his dealers with good stuff; (7) telling that supplier that he also had something better coming his way and that he would call as soon as he got it and get him some; (8) giving instructions to Brown; (9) reassuring someone that he would get him what he wanted in order to keep his business; (10) denying responsibility for alleged poor drug quality because while he personally "gr[ound] the shit," he left if for someone else to finish preparing; (11) asking two subordinates whether customers were satisfied with the product and then agreeing to provide more because it was selling well; (12) agreeing to pay a subordinate on a weekly basis and discussing his cut; and (13) looking for dealers to work out of a new location.

A-2640-17T4

Moyer also explained that a high-level drug distribution organization dealt with large quantities of drugs and operated in a hierarchy with a number of co-conspirators moving merchandise between supplier and the street level sellers. In Camden, a single purchase of 100 grams of heroin suggested that the purchaser was involved in a high-level drug distribution organization. Based upon his review of the information obtained by police during the course of the investigation, Moyer opined that Edwin was the organization's leader and supplied the drugs sold by everyone involved. Webb was Edwin's assistant or "consigliere."

According to Moyer, the organization eventually split into two factions, one led by Calm and Anderson, and the other led by Ingram, with Brown working for both factions. Moyer described Brown as a "set manager" who supervised Lee and Timmons. Other lower level members of the organization included Gazarra and Colavecchio. Gutierrez maintained the stash house.

Moyer said the investigation was impeded because they had difficulty getting Edwin's phone number and he ceased making calls after the wiretap on his phone "went live." Moyer thought that Bailey learned of the wiretaps and warned Edwin. He was not surprised that they failed to record Edwin talking about drugs since it was common for the head of a drug organization not to be

involved in discussions of that sort. Moyer acknowledged that, per the intercepted calls and texts, it appeared that Calm and Anderson believed that Bailey objected to Edwin's involvement with them. He did not know of any specific information she provided to the organization to facilitate drug activity.

Lieutenant Joseph Hoffman testified that officers are not allowed to disclose confidential information to civilians or otherwise interfere with the administration of justice, and that they were also required to report criminal activity. The prosecutor played Bailey's statement during Hoffman's testimony. Hoffman confirmed that Edwin's last conviction was in 2007.

Ingram did not testify. He did not present any witnesses on his behalf.

Bailey testified that she was thirty-one years old, had completed two years of college, and worked for four years as a corrections officer in Delaware before deciding to attend the New Jersey police academy. She had no criminal record. She married Edwin in 2011, fully aware that he had been incarcerated. Bailey attributed the intermittent nature of her relationship with Edwin to ongoing domestic violence, including an incident where he shot her in the leg, and other problems. She confirmed that, on July 15, 2016, Edwin died of an apparent heart attack at age thirty-two.

A-2640-17T4

Bailey claimed that she disclosed Edwin's criminal history at the time she applied to work in various police departments, including the Camden County police department. It made it difficult for her to find a job in law enforcement. Maddox was her supervisor.

Bailey insisted that, contrary to her statement, she actually told Maddox, whom she said knew of Edwin's criminal background, that she needed a restraining order against Edwin because she could not "take the . . . beatings anymore." However, Maddox's only response was to say "[you have] a gun, use it." Bailey also maintained that, at a party, Hoffman told her to leave Edwin because Edwin was going to "take [her] down with him." She stated that she stayed with Edwin because she loved him and they had children, including a third child born after police made their arrests in this case.

According to Bailey, Edwin also lied to her, cheated on her, and hung around with the wrong people including Calm, Anderson, Ingram, and Webb. She felt it was her job to stop her husband from participating in their drug activities. She did not get along with Calm, Anderson, or Ingram, all of whom resented her attempts to keep Edwin away from them, but she did have a decent relationship with Webb. Because Edwin avoided her and she did not always have a number where she could reach him, she would call Calm in an effort to

17

reach Webb, who would usually tell her where she could locate Edwin. She insisted that she called Calm 129 times in June and July 2014 because she was looking for Edwin, not because she wanted to speak to Calm.

Bailey testified that she looked up Edwin and Calm in the LEAA to see if Edwin was telling the truth when he said he was not hanging around with Calm. She knew her activities could be tracked. Bailey saw that Edwin and Calm had been stopped together, and discussed what she learned only with Edwin because she wanted him to know she knew he was lying to her about Calm. Nothing she read in any of the reports she accessed referenced an intelligence report or a police event that was going to occur in the future. She had no access to intelligence information and never tried to enter the department's separate intelligence database. Notably, she admitted that Calm did ask her on one occasion to check into an open investigation, but insisted that she refused to do this for him, although she looked into things for personal reasons.

Bailey claimed she stopped home after the October 23 briefing, knowing she could be tracked, because she needed her flashlight and cuff keys, and to get her children ready for school. She acknowledged that she asked Edwin if he knew anything about what she had learned at the briefing, and that their conversation grew heated. Bailey denied that she intended to share confidential

information with him, and did not believe she had, admitting that it was possible she might have revealed something in the heat of the argument. She did not recall everything she said.

Bailey explained the September 2014 text exchange captured by the State as merely a discussion about her relationship with Edwin, not the drug organization. Edwin had told her that he had heard she was being investigated by her department. He thought she would be okay, though, because she was not a crooked cop. When Bailey said there was more, she was referring to having run his name in the LEAA. Telling Edwin he was not going to believe what she had been told that night was merely a reference to Hoffman's statement that Edwin was going to take her down with him, which she believed confirmed she was under investigation.

On cross-examination, Bailey denied being the aggressor in her relationship with Edwin. She admitted that, as described in certain text messages, on September 6, 2014, she set fire to a car Edwin drove, but which she claimed was in her name. She wanted to disable the car because he was using it for illegal purposes and she did not want to get in trouble. Bailey eventually conceded that the car was registered to one Carl Bagby, Jr. Bailey confirmed that she also threatened to set fire to a van she owned but Edwin

drove. She insisted that she was not trying to stop Edwin because she knew about the wiretap.

Bailey denied any knowledge of a large drug organization, and said she had no specific proof that Edwin was a drug dealer. She never actually saw anyone selling drugs. If she had known actual details, she would have reported them.

On rebuttal, Detective Clement Fuscellaro, who recruited Bailey, testified that she never told him that Edwin shot her and that he had no separate knowledge of the incident. Maddox denied that Bailey told him she was the victim of domestic violence, and said he never advised her to shoot Edwin rather than get a restraining order. Hoffman said he did not tell Bailey to leave Edwin, or that she was the subject of an internal affairs investigation prior to her October 28, 2014 interview. On surrebuttal, Bailey's son, Tyjee Kellem, then age fifteen, testified that Edwin had shot Bailey in the leg.

Ingram raises the following points:

> POINT I
> THE EXPERT OPINION PLACING THE DEFENDANT IN THE MIDDLE OF A NARCOTICS TRAFFICKING ORGANIZATION WAS UNDULY PREJUDICIAL AND WAS BASED ON ABSENTEE WITNESSES.

A.   The Expert Opinion Should Have Been Excluded.

1.   The Expert Opinion Was Speculative, Embodied the Ultimate Issue in the Case, and Usurped the Function of the Jury.

2.   The Expert Opinion Should Have Been Excluded Because It Was Based on Extensive Hearsay by Absentee Witnesses Not Subject to Confrontation.

B.   The Expert Witness Instruction Was Deficient.

POINT II
THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. I, PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE CONTRADICTORY, CONFUSING, ERRONEOUS, AND PREJUDICIAL JURY INSTRUCTIONS ON THE LAW OF A LEADER OF A NARCOTICS TRAFFICKING NETWORK.

A.   The Instruction Was Contradictory and Confusing.

B.   The Trial Court Failed to Instruct Jurors that the Defendant Could Be Convicted of a Lesser Offense Based on His Own Intent and Participation in the Crime.

C.   The Trial Court Failed to Mold the Law to the Facts.

D.   The Instruction on the Law of Conspiracy to Commit a Drug Distribution Offense, a Predicate

Offense for the Leader Crime, Was Neither Clear nor Understandable.

POINT III
THE PROSECUTOR IMPROPERLY PERSUADED THE JURY WITH A DRUG TRAFFICKING NETWORK CHART SHE CREATED THAT WAS NOT INTRODUCED INTO EVIDENCE AND WAS NOT PROVIDED TO COUNSEL.

POINT IV
THE TRIAL COURT IMPROPERLY ADMITTED IRRELEVANT AND UNDULY PREJUDICIAL EVIDENCE.

POINT V
A JUDGMENT OF ACQUITTAL SHOULD HAVE BEEN ENTERED BY THE COURT.

A.    A Judgment of Acquittal Should Have been Entered on the Charge of Maintaining a Narcotics Nuisance.

B.    The Trial Court Should Have Entered a Judgment of Acquittal on the Charge of Being a Leader of a Narcotics Trafficking Network.

POINT VI
THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1, PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE ACCUMULATION OF ERRORS.

POINT VII
THE SENTENCE IS EXCESSIVE.

22

A. The Trial Court Improperly Balanced the Aggravating and Mitigating Factors.

B. The Imposition of a Life Sentence Plus Ten Years is Cruel and Unusual and Shocks the Judicial Conscience.

Bailey asserts the following errors occurred:

POINT ONE:
THE STATE'S ADMISSION OF TEXT MESSAGES BETWEEN DEFENDANT AND HER HUSBAND, SUBJECT TO THE MARITAL PRIVILEGE, DENIED DEFENDANT A FAIR TRIAL.

POINT TWO:
THE STATE'S ADMISSION OF INADMISSIBLE OTHER CRIMES EVIDENCE DENIED DEFENDANT A FAIR TRIAL.

POINT THREE:
DEFENDANT WAS ENTITLED TO JUDGMENTS OF ACQUITTAL ON THE OFFICIAL MISCONDUCT COUNTS.

POINT FOUR:
THE TRIAL COURT'S IMPROPER JURY INSTRUCTION ON OFFICIAL MISCONDUCT DENIED DEFENDANT A FAIR TRIAL.

POINT FIVE:
THE PROSECUTOR'S QUESTIONING OF DEFENDANT ABOUT AN UNCHARGED ARSON WITHOUT FIRST ADVISING DEFENDANT OF HER FIFTH AMENDMENT RIGHTS WAS ERROR.

23

POINT SIX:
THE TRIAL COURT WRONGFULLY DENIED
DEFENDANT'S MOTION FOR A NEW TRIAL.

POINT SEVEN:
DEFENDANT RECEIVED AN EXCESSIVE
SENTENCE.

We address the points in combination where appropriate. We first discuss Ingram's claims of error, then turn to Bailey's.

### III. INGRAM

#### A.

Ingram contends that the trial court erred in permitting Moyer to opine that he was a central figure in the narcotics trafficking organization. He further contends that the jury charge regarding expert witnesses was deficient.

It is improper for an expert to opine as to a defendant's guilt. State v. Odom, 116 N.J. 65, 77 (1989). However, as long as the expert does not express his opinion regarding guilt but simply characterizes a defendant's conduct based on the evidence in light of his specialized knowledge, the opinion is not objectionable even though it embraces ultimate issues that the jury must decide. Id. at 79. In instructing the jury, a trial court must emphasize that the determination of ultimate guilt or innocence is the jury's exclusive provenance. Id. at 82.

Experts in drug-distribution cases are permitted to offer necessary insight into matters not commonly understood by the average juror, such as the significance of drug packaging and weight, the function of drug paraphernalia such as scales, baggies and cutting agents, the meaning of drug logos, the value of the drugs and how low-level drug transactions are arranged and carried out. State v. Cain, 224 N.J. 410, 413-14, 426 (2016). However, once apprised of the peculiar characteristics of a drug-distribution scheme, it is left to the jurors to decide whether a defendant possessed the requisite mental state to commit a particular drug offense. Id. at 413-14, 426-27. The expert may not intrude on the jury's exclusive domain as factfinder by offering "ultimate-issue testimony" either directly or by way of answers to loaded hypothetical questions that "may be viewed as an expert's quasi-pronouncement of guilt . . . ." Id. at 427. The jury must sort through the evidence and use its "common sense to make simple logical deductions." Ibid.

Ingram's high-level role with the drug network was evidenced by the intercepted texts and calls, the seizures from his home, and his own statements, including his admission that others including Brown worked for him. Moyer did not specify individuals supervised by defendant. His narrowly focused and brief expert testimony regarding defendant's position within the organizational

hierarchy was supported by and corroborated the overwhelming proofs regarding Ingram's role in this large drug distribution network. It was that evidence, not Moyer's statement, which allowed the jury to draw its conclusions regarding Ingram's leadership role.

Ingram also contends for the first time on appeal that Moyer's expert testimony regarding the organizational hierarchy should have been excluded because it relied in part upon recorded conversations not played to the jury. We do not agree that this makes the admission of Moyer's narrowly focused opinion error. Ingram notes his trial attorney objected to Moyer's interpretation of a recorded conversation that was played for the jury—however, it was not objected to with regard to his opinion on the structure of the organization. Furthermore, Bailey's attorney actually sought to limit the recordings presented at trial.

Ingram also now contends for the first time that the jury charge regarding expert witnesses was deficient because the court did not instruct the jury to avoid giving an expert's factual testimony greater weight because he is qualified as an expert. This argument also lacks merit.

Moyer testified as a fact witness, describing the investigation and Ingram's statement. As an expert, he assisted the jury in understanding the import of the

numerous recordings they heard and the hierarchy of the drug organization. There was a clear divide between the two areas covered by his testimony. Ingram does not even identify the particular prejudice that inured to him because of the lack of the instruction he claims was necessary.

The trial court properly instructed the jury, following the model jury charge, as to how to consider Moyer's expert testimony both when he testified and then again in the final charge. Model Jury Charges (Criminal), "Expert Testimony" (revised Nov. 10, 2018). Thus, the court's admission of Moyer's testimony was not error, much less plain error. See R. 1:7-5.

B.

It is axiomatic that "[a]ppropriate and proper charges to a jury are essential for a fair trial." State v. Maloney, 216 N.J. 91, 104-05 (2013) (alteration in original) (quoting State v. Green, 86 N.J. 281, 287 (1981)). Erroneous instructions on "matters or issues material to the jury's deliberations" are presumed to be reversible error. State v. Jordan, 147 N.J. 409, 422 (1997). The presumption of prejudicial error exists even when no objection was raised below by defense counsel. State v. Federico, 103 N.J. 169, 176 (1986).

However, if defense counsel fails to challenge the instructions given, reversal will only be warranted where the alleged error was "clearly capable of

27

producing an unjust result . . . ." R. 2:10-2; State v. Torres, 183 N.J. 554, 564 (2005); Jordan, 147 N.J. at 421. Plain error in the context of a jury charge requires demonstration of

> "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [State v. Burns, 192 N.J. 312, 341 (2007) (alteration in original) (quoting Jordan, 147 N.J. at 422).]

A jury charge "must be read as a whole in determining whether there was any error." Torres, 183 N.J. at 564. Moreover, the effect of any error must be considered "in light of the overall strength of the State's case." State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

Although the inclusion of specific references to the evidence by the court during a jury charge has been deemed the "better practice" by our Supreme Court, State v. Concepcion, 111 N.J. 373, 379 (1988), the failure of a trial judge to so charge the jury usually becomes of paramount importance only where conflicting testimony pointing to divergent verdicts is involved, and where the charge emphasizes only one side's version of the pertinent events. State v. Martin, 119 N.J. 2, 16-17 (1990); State v. Bilek, 308 N.J. Super. 1, 10-14 (App.

28

Div. 1998). Indeed, our Supreme Court has cautioned that the absence of such a detailed charge does not constitute per se plain error warranting reversal, but that the omission must be viewed in the context of the evidence of the case in order to determine its prejudicial effect. See Concepcion, 111 N.J. at 381.

Ingram now argues that the model jury charge regarding the leader of a narcotics trafficking network was "incomprehensible" for a variety of reasons. He contends that the charge was inherently contradictory because it requires a defendant supervise "at least one other person" for purposes of the third element of the offense, while supervising "others" for the fourth element. Thus, he suggests that the reference to "one other person" should be deleted from the model charge and "others" retained because "the [l]eader is 'high' in the network." Given the testimony supporting his employment of several individuals, the alleged flaw is irrelevant and does not require further discussion.

Ingram additionally attacks the model jury charge on the basis it failed to provide the jury with guidelines they might employ in assessing whether a defendant acts "with a lesser degree of criminal culpability than other principals and accomplices." The point, however, is irrelevant. Ingram was charged as a principal, not an accomplice.

Ingram further contends that the judge should have: (1) molded the leader charge to the facts in the case because of the innumerable options the jury had under the charge (some of which he contends, without elaboration, were not supported by the record) for finding defendant guilty; and (2) specifically omitted inapplicable portions of the charge such as that which referred to dispensing drugs to a "research subject pursuant to the order of a practitioner." As the State notes, had the court attempted this, defendant would have likely argued on appeal that the court invaded the province of the jury. Given Ingram's confession, and specific admissions, these contentions do not warrant discussion. R. 2:11-3(e)(2).

Ingram contends that the narcotics leader charge allowed the jury to convict him based upon "an agreement to attempt to attempt the transference of drugs." The claim is not supported by the record. Ingram's own admissions made it clear he never disputed the fact he was a drug dealer. Rather, he disputed the extent of his role in the narcotics network. This argument is also irrelevant and does not require additional discussion.

C.

Ingram raises four points of error that do not require discussion in a written opinion given the overwhelming nature of the State's proofs, which

A-2640-17T4

included recordings, text messages, visual observations, the seizure of physical evidence, and his confession. R. 2:11-3(e)(2). We begin with Ingram's point that the prosecutor's display of a chart depicting the hierarchy of the drug trafficking network was prejudicial. Ingram's counsel did not join in Bailey's objection, which was grounded on her claim that she had not been provided the chart in discovery. The prosecutor assured the court that although the chart was modified to reflect the proofs at trial, it was similar to others provided in discovery, and that she intended to display it for just a few seconds. She did so both in the beginning and the end of her summation. Ingram's attorney posed no objection while Bailey's counsel challenged the use of the chart in the motion for a new trial. The judge ruled it was an admissible demonstrative aid. To contend the admission was prosecutorial misconduct is not supported by the record. See R. 2:11-3(e)(2).

Ingram also argues he was denied a fair trial because the State presented a series of police witnesses who testified regarding the raids at the homes of other participants in the network, without specifically connecting him to the premises. The raids were conducted at the homes of those the State alleged Ingram controlled in the drug network. The ongoing conspiracy to distribute

drugs, as substantiated in the State's proofs, established his connection to those items in the absence of physical proof at the location. See R. 2:11-3(e)(2).

Ingram further contends that the court erred in denying his motion for a judgment of acquittal on the charge of maintaining a narcotics facility. Trial counsel sought such a dismissal, but Ingram admitted to police that the substantial quantity of drugs found in his home had been there for some time. Based on all the State's evidence, the judge properly concluded a reasonable jury could infer Ingram's residence was used on an ongoing basis, and denied the motion. See R. 2:11-3(e)(2).

When Ingram confessed, he insisted that he worked for himself, and that he worked with others only on one or two occasions. Thus, he now argues, the State did not establish that he was the leader of a narcotics network. In light of the State's overwhelming proofs, we disagree. R. 2:11-3(e)(2).

Ingram also contends that the cumulative errors warrant reversal. We see no error whatsoever, thus this argument too must fail. R. 2:11-3(e)(2).

D.

Ingram contends that in sentencing him, the court did not correctly weigh the applicable aggravating and mitigating factors. We disagree.

Ingram's extensive criminal history included multiple juvenile adjudications, six municipal court convictions, twelve indictable convictions, plus an out-of-state felony conviction. As a result, the court found the following aggravating factors: the risk Ingram would commit another offense, N.J.S.A. 2C:44-1(a)(3), his prior record, N.J.S.A. 2C:44-1(a)(6), and the need for deterrence, N.J.S.A. 2C:44-1(a)(9). The judge found no mitigating factors, and weighed all the aggravating factors heavily in light of Ingram's past criminal record and the nature of this offense in light of that record.

In reviewing a criminal defendant's sentence, we must determine whether the findings of fact regarding aggravating and mitigating factors were based on competent and reasonably credible evidence in the record, whether the trial court applied the correct sentencing guidelines enunciated in the Code, and whether the application of the factors to the law constituted such clear error of judgment as to shock the judicial conscience. State v. Fuentes, 217 N.J. 57, 70 (2014); State v. O'Donnell, 117 N.J. 210, 215-16 (1989); State v. Jarbath, 114 N.J. 394, 401 (1989). In the process of reviewing the sentence, we must avoid substituting our judgment for the judgment of the trial court. State v. Cassady, 198 N.J. 165, 180 (2009); O'Donnell, 117 N.J. at 215; State v. Roth, 95 N.J. 334, 365 (1984).

In this case, the factors were correctly weighed based on evidence in the record. The sentence, in light of the legislatively mandated range, does not shock our judicial conscience.

## IV. BAILEY

### A.

During the trial, the State presented one text message exchange between Bailey and Edwin, dated September 2014. We have recounted that exchange fully in the fact section of that opinion. Bailey argues first that the trial court's decision to admit the exchange pursuant to the crime-fraud exception to spousal privilege violated federal and state ex post facto laws.

The marital communications privilege codified at N.J.S.A. 2A:84A-22 and set forth in N.J.R.E. 509 "stems from the strong public policy of encouraging free and uninhibited communication between spouses, and, consequently, of protecting the sanctity and tranquility of the marriage relationship." State v. Terry, 218 N.J. 224, 233 (2014) (quoting State v. Szemple, 135 N.J. 406, 414 (1994)). Nonetheless, the marital communications privilege, like other privileges, is generally construed narrowly because it can shield relevant evidence from factfinder review and, thus, undermine the search for the truth. Id. at 239.

The crime-fraud exception to the marital communications privilege, N.J.R.E. 509(2)(e), was adopted on November 9, 2015, based upon a recognition that the privilege was not meant to protect the planning or commission of crimes. Id. at 239-40; N.J.R.E. 509(2)(e). It provides that there is no marital privilege "in a criminal action or proceeding if the communication relates to an ongoing or future crime or fraud in which the spouses or partners were or are joint participants at the time of the communication." N.J.R.E. 509(2)(e). Notably, although our Supreme Court in Terry had urged the adoption of this exception, it expressed no opinion as to whether it should be applied in cases where the defendant spouses' wrongdoing preceded its adoption. Terry, 218 N.J. at 245-46. The rule itself does not specify any time limitations. N.J.R.E. 509.

However, it is a well-settled principle that new rules "relating only to modes of procedure and the conduct of trials, in which no one can be said to have a vested right, apply if they are in effect at time of trial, regardless of when the underlying crime was committed." Rose, 425 N.J. Super. at 468. New rules addressing the admissibility of evidence are considered to be procedural in nature and thus applicable if in effect at the time of trial. Ibid.

It is true that both the United States and New Jersey Constitutions disallow the passing of ex post facto laws. Ibid. However, this prohibition exists "to

guarantee that criminal statutes 'give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.'" State v. Muhammad, 145 N.J. 23, 56 (1996) (quoting Weaver v. Graham, 450 U.S. 24, 28-29 (1981)).

A statute violates this ban if it "either (1) punish[es] as a crime an act previously committed, which was innocent when done; (2) make[s] more burdensome the punishment for a crime, after its commission; or (3) deprive[s] a defendant of any defense available according to the law at the time when the crime was committed." Rose, 425 N.J. Super. at 468 (quoting Muhammad, 145 N.J. at 56). There is no ex post facto violation "if the change in the law is merely procedural and does not increase the punishment, nor change the ingredients of the offense or the ultimate facts necessary to establish guilt.'" Id. at 468-69 (quoting State v. Natale, 184 N.J. 458, 491 (2005)).

New rules of evidence generally do not violate the ex post facto clause. Id. at 469. It is only when a law lowers the quantum of proof necessary to obtain a conviction that the clause is implicated. Ibid.; accord State v. Sanchez-Medina, 231 N.J. 452, 467 (2018) ("new rules of evidence that do not lower the level of proof needed to convict a defendant generally apply at trial, even if they are adopted after the commission of a crime but before trial").

36                                                              A-2640-17T4

Bailey's objection must fail because the long-standing doctrine is intended to protect the marital privilege, not the planning or commission of crimes. The marital privilege has always been subject to narrow construction, and the crime fraud exception in no way lowered the quantum of evidence needed to convict her.

Bailey also contends that the exchange did not satisfy the crime fraud exception because it lacked specificity as to future joint criminal enterprise. We disagree because the exchanges reflected Bailey's concern about her role in the context of the ongoing investigation into the still operational drug organization and the potential effect it would have on the balance of her life. Nonetheless, it is noteworthy that Bailey was acquitted of conspiracy. It cannot fairly be said that she was prejudiced by the admission of the texts. The State's factual basis for the convictions was Bailey's review of LEAA records and communication to Edwin regarding the forthcoming raid, based on information she received on the job.

## B.

Bailey also contends that the judge erred in allowing the prosecutor to question her regarding the arson of her car as violating the principles found in State v. Cofield, 127 N.J. 328, 338 (1992), and her Fifth Amendment right

against self-incrimination, U.S. Const. amend V, § 2. The information regarding Bailey setting fire to the car that Edwin used was obtained from their text message exchanges. The State indicated it would only use those texts if Bailey opened the door while testifying. The judge instructed the prosecutor to renew any objection later during the testimony, but that he would not rule in advance. When Bailey made statements to police, she said she wanted to end her relationship with Edwin, tell her supervisor about domestic violence in her home, and that Edwin was assaulting her—but she had not done so. When asked on direct if there was physical violence in her relationship with Edwin, she claimed he had shot her in the leg, a grazing wound, that there was ongoing violence in the home, that she had told her supervisor that she needed a restraining order, and that he had told her "[you have] a gun, use it."

On cross-examination, Bailey acknowledged that when interviewed by police she denied having reported the domestic violence to her supervisor. She continued to insist that she had been a victim and denied she was the aggressor. When the prosecutor asked her what she had done to Edwin's car, Bailey's attorney immediately requested a sidebar and argued that the admissibility of those statements should have been the subject of a Cofield hearing. The court agreed with the prosecutor that the door had been opened by the defense.

38

Bailey then acknowledged that she set fire to a car she insisted was her own, although used by Edwin, that she did so because she did not want him to compromise her by using the car for illegal purposes, and that she had also threatened to set fire to a van Edwin drove. On re-cross, Bailey admitted the car she set on fire was registered to another person. She denied setting the fire because she knew of the ongoing wiretap.

Bailey's attorney then moved for a mistrial, contending that Bailey should have been advised of her Fifth Amendment rights before she was questioned regarding uncharged crimes in front of the jury. The trial court denied defense counsel's motion ruling that:

> As to the application [for] a mistrial, the standard is whether there is a manifest denial of justice with reference to the way the case proceeded. I do not find that there was a manifest injustice that occurred.
>
> Counsel for [Bailey] was aware of the fact that there w[ere] representations that certain messages would not be used unless the door was opened, if you will, to the domestic violence issue. That was clearly opened by the defense in the direct testimony of [Bailey]. I . . . didn't allow, I think too far down the road [sic], but I did allow questions, because there w[ere] additional questions that [the prosecutor] wanted to ask that I sustained an objection when she wanted to actually introduce the text messages themselves [sic]. But as to the way the question was asked and the answer was given, I don't find a manifest denial of justice.

A-2640-17T4

During Bailey's motion for a new trial, Bailey's attorney raised several meritless arguments as to this testimony, including that not only was she denied a fair trial because the matter was not subjected to a hearing pursuant to N.J.R.E. 403 and N.J.R.E. 404(b), the jury was not provided a proper limiting instruction. The prosecutor reiterated that Bailey opened the door, that N.J.R.E. 404(b) was not implicated and that the testimony was not unduly prejudicial.

The trial court found that the arson evidence was properly admitted under the "opening the door" doctrine described in State v. James, 144 N.J. 538 (1996), explaining:

> The Court agrees the evidence of arson would be inadmissible but for [Bailey's] contention that she was the victim of an abusive relationship.
>
> The testimony implied her judgment and volition were compromised by her abusive husband. This is significant considering the charged offense required that [Bailey] acted knowingly.
>
> Accordingly, the state . . . of her past marriage becomes material and the State was justified for impeaching her credibility and directly contradicting her claim.
>
> The [prosecutor's] use of the evidence was clearly intended only to rebut the battered woman syndrome claim which implied she did not act with the appropriate mens rea with respect to the official misconduct offense.

A-2640-17T4

Furthermore, it was presented within the appropriate scope during cross-examination as opposed to the [p]rosecutor's case-in-chief.

The use of the evidence fits squarely into the type contemplated by the James Court. [Bailey] cannot present selective pieces of evidence of her state of marriage while precluding the State from arguing the proper context for considering the evidence.

The fact that it prejudiced the defendant is not in and or itself grounds for relief because its probative value carried sufficient weight.

As a result the court finds the introduction of the evidence . . . regarding the burned vehicle did not violate Rule of Evidence 403.

The trial court then went on to perform an N.J.R.E. 404(b) analysis. Specifically, it found that: (1) the arson evidence was relevant; (2) evidence of Bailey's mental state was not required to be similar in kind to the offense charged; (3) Bailey setting fire to the car used by her husband was established by her own text messages; and (4) the prosecutor used this evidence solely to attack her claim of being victimized by her husband and, therefore, it was not unduly "inflammatory as it was a clear attack on [Bailey's] credibility and no implication was made as to the propensity for committing crimes." In sum, the court was satisfied that there was no "reasonable doubt that the presentation of

41

the evidence may have led the jury to reach a conclusion it would not have otherwise come to."

Bailey's argument is two-fold—that the trial judge erred in admitting the testimony and denying her motion for a new trial. We do not reverse decisions denying motions for a new trial "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1; see also State v. Carter, 91 N.J. 86, 96 (1982). We defer to the findings of the trial court with respect to "intangible[s]" not transmitted by the record, but otherwise make our own independent determination of whether justice was served. Dolson v. Anastasia, 55 N.J. 2, 6-8 (1969).

The doctrine of "opening the door" is a "rule of expanded relevancy" whereby irrelevant or inadmissible evidence may sometimes be admitted if the "opposing party has made unfair prejudicial use of related evidence." James, 144 N.J. at 554. In criminal cases, the doctrine "operates to prevent a defendant from successfully excluding from the prosecution's case-in-chief inadmissible evidence and then selectively introducing pieces of this evidence for the defendant's own advantage, without allowing the prosecution to place the evidence in its proper context." Ibid. The doctrine is limited, though, by N.J.R.E. 403, and evidence to which a defendant has "opened the door" may still

42

be excluded if a court finds that its probative value is outweighed by the risk of undue prejudice.  Ibid.

Pursuant to N.J.R.E. 404(b):

> (1) . . . [E]vidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition.
>
> (2) . . . This evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute.

Our Supreme Court has clarified that such evidence may be admitted provided it meets the following test:

> 1.    The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2.    It must be similar in kind and reasonably close in time to the offense charged;
>
> 3.    The evidence of the other crime must be clear and convincing; and
>
> 4.    The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [State v. Cofield, 127 N.J. 328, 338 (1992).]

This analysis is intended to reduce the underlying danger that the jury may convict a defendant because he or she is "a 'bad' person in general."  Id. at 336

(quoting State v. Gibbons, 105 N.J. 67, 77 (1987)); accord State v. Reddish, 181 N.J. 553, 608 (2004); State v. Koskovich, 168 N.J. 448, 482 (2001). Notably, "[t]emporality and similarity of conduct is not always applicable, and thus not required in all cases." State v. Rose, 206 N.J. 141, 160 (2011); State v. Williams, 190 N.J. 114, 131-32 (2007).

When other-crime evidence is admitted for a particular purpose, the court must instruct the jury on the limited use of the evidence. Cofield, 127 N.J. at 340-41. This instruction must "clarify for the jury the narrow distinction between the permissible and impermissible uses of the other-crime evidence . . . ." Id. at 341 (quoting State v. Stevens, 115 N.J. 289, 308-09 (1989)); accord State v. Gillispie, 208 N.J. 59, 92-93 (2011); Williams, 190 N.J. at 133-34.

The decision to admit or exclude other crimes or wrongs evidence rests within the trial court's sound discretion and will only be reversed upon an abuse of that discretion. Gillispie, 208 N.J. at 84. Where, however, a trial court has improperly applied or failed to apply the Cofield analysis, an appellate court's review is de novo. Rose, 206 N.J. at 158; State v. Darby, 174 N.J. 509, 518 (2002).

A-2640-17T4

In Bailey's statements to police as well as her direct testimony, Bailey attempted to portray herself as a victim of an abusive relationship to excuse her conduct and excuse alleged acts of official misconduct and her alleged participation in the conspiracy to distribute drugs. It is therefore clear that the arson evidence properly challenged the credibility of her statements and was not unduly prejudicial.

The issue of Bailey's Fifth Amendment rights was not raised pre-trial, even though defense counsel was well aware that the arson might be admitted if Bailey opened the door. There is no legitimate basis for Bailey to now raise the claim. See N.J.R.E. 502; State v. Patton, 133 N.J. 389, 396 (1993) (holding the privilege is implicated when information is compelled); State v. McGraw, 129 N.J. 68, 77 (1992). There was no indication in the trial record, prior to the trial or during the proceeding that the State intended to prosecute Bailey for setting fire to the car. Thus, having opened the door, she was properly questioned regarding the arson.

As we have said, the factual basis for the allegations of official misconduct were in count seventy-two that Bailey improperly accessed the LEAA database, and in count seventy-three, that she committed misconduct by conveying information from an October 23, 2014 intelligence briefing to her husband. When the issue was argued pre-trial, the judge said that the argument could be made that Bailey did not derive a benefit from her action—or that she did. She acknowledged that her actions were improper to police. As the judge said, "[w]hether her motivation was a personal motivation to check up on her husband, which is what she had indicated, or whether her purpose was to help her husband in furtherance of the criminal dispute was a question of fact for the jury."

A public servant is guilty of official misconduct when, "with purpose to obtain a benefit for himself or another," he "commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner." N.J.S.A. 2C:30-2(a). Importantly, a defendant need not actually gain a benefit in order to be convicted of official misconduct; rather the defendant

must simply act "with purpose to obtain a benefit for himself." State v. Saavedra, 222 N.J. 39, 60 (2015).

A "benefit" is a "gain or advantage, or anything regarded by the beneficiary as gain or advantage, including a pecuniary benefit or a benefit to any other person or entity in whose welfare he is interested." N.J.S.A. 2C:27-1(a). A benefit is a positive inducement and includes not only pecuniary consideration but any reward. State v. Scirrotto, 115 N.J. 38, 46, 49 (1989). The benefit sought or obtained by the defendant may be the indirect result of his or her actions. State v. Schenkolewski, 301 N.J. Super. 115, 139-40 (App. Div. 1997).

It is not necessary that the defendant's activity be criminal under another section of the Code in order to constitute the crime of official misconduct under N.J.S.A. 2C:30-2. State v. Parker, 124 N.J. 628, 640 (1991). Where the violation of official duty is by engaging in criminal activity, the defendant may be convicted of misconduct even if he is acquitted of the underlying crime. Ibid.

Bailey now contends that as to count seventy-two the State proved only that she committed an administrative violation because she was permitted to access the LEAA database, the reports she accessed did not reveal pending police actions or reference ongoing investigations, and the State did not establish

any use that she made with the information that she obtained. She further contends as to count seventy-three that the State could not have proven she was guilty of official misconduct because the information was given at a phony briefing, and was therefore not capable of placing another officer in danger nor was it confidential, and that the information, which she relayed to Edwin in the heat of an argument, did not benefit anyone.

These arguments ignore the reality that even if the State was not able to prove a concrete benefit, the State did prove that Bailey's intent was to secure such a benefit, whether to protect her husband or otherwise. See State v. Moffa, 42 N.J. 258, 263 (1964) (for purposes of a motion for judgment of acquittal, the State must be given the benefit of all favorable inferences that could reasonably be drawn from the evidence). The State is not required to prove that Bailey actually obtained a specific concrete benefit. Saavedra, 222 N.J. at 60. In this case, monitoring her husband and his associates' activities, and tipping him off when she believed a raid was about to occur, sufficed. Thus, the court did not err in denying her motion for judgment of acquittal.

D.

Bailey also contends that the charge the judge gave, which tracked the model jury charge, was improper. She asserts the judge erred because he told

the jury that she could be convicted if it found she acted to benefit herself or another.

Reading the charge as a whole, it is clear that the drug organization qualified as a potential beneficiary as an extension of Bailey, given her personal interest in its success and involvement with her husband. The only "other" beneficiary identified from the court was the drug organization. Thus, the court's model jury charge was not an improper expansion of the indictment, nor did it create the possibility of an unjust result. Having failed to establish such an outcome, given her failure to object to the charge before the trial judge, this point must also fail. See R. 2:10-2; Torres, 183 N.J. at 564.

E.

Finally, Bailey contends the sentence was excessive. The judge found aggravating factors three, N.J.S.A. 2C:44-1(a)(3), the risk Bailey would reoffend; breach of the public trust, aggravating factor four, N.J.S.A. 2C:44-1(a)(4); and the need for deterrence, N.J.S.A. 2C:44-1(a)(9).

The court explained his finding of aggravating factor three because the conduct here was not an isolated incident, but "an ongoing episode . . . . " He further found aggravating factor four, stating it was not double-counting, because finding that factor recognized the Legislature's concern that elevated

49

the conduct to one requiring a separate aggravating factor. He found aggravating factor nine because a person who takes an oath and becomes involved in law enforcement has a particular obligation to comply with the law. This is especially true in narcotics investigations where misuse of information poses a serious danger to other officers.

The court did find two mitigating factors, Bailey's lack of a prior record, N.J.S.A. 2C:44-1(b)(7), and undue hardship to her family, N.J.S.A. 2C:44-1(b)(11). The court, assigning limited weight to mitigating factor eleven, found on a qualitative and quantitative basis that the aggravating factors outweighed the mitigating.

The evidence the court relied upon in reaching its findings of aggravating and mitigating factors was clearly substantiated by the record. The sentence does not shock the judicial conscience. Fuentes, 217 N.J. at 70; O'Donnell, 117 N.J. at 215-16; Jarbath, 114 N.J. at 401. We do not substitute our judgment for that of the trial court. Cassidy, 198 N.J. at 180; O'Donnell, 117 N.J. at 215; Roth, 95 N.J. at 365. Bailey argues that aggravating factor three should not have been found—however, it cannot be disputed that this was not an isolated instance. Given Bailey's role as a police officer, and her decision to participate

in these activities, it was reasonable for the judge to have concluded she was at risk of reoffense.

With regard to aggravating factor four, we do not agree that this was a mechanistic application of the factor. A police officer is not just a public servant; the public relies on his or her good conduct and reposes significant public trust in him or her. Thus, we think that the findings were warranted. This was not an excessive sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2640-17T4